IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-5147
_____


DAVID L. HAWKINS,

Petitioner,

v.

AGRICULTURAL MARKETING SERVICE,
DEPARTMENT OF AGRICULTURE, U.S.A.,

Respondent.

_____

On Petition for Review of a Final Order
of the Secretary of Agriculture
_____
(December 21, 1993)

Before REYNALDO G. GARZA, KING and DeMOSS, Circuit Judges.

KING, Circuit Judge:

David L. Hawkins seeks review, pursuant to 28 U.S.C. § 2342, of a final order of the administrator of the Agricultural Marketing Service of the United States Department of Agriculture. The administrator affirmed the presiding officer's decision, which found that Hawkins was "responsibly connected" with Fruit Jobbers, Inc., during a time when Fruit Jobbers committed "repeated and flagrant" violations of the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a et seq. We deny the petition for review and affirm the order.

## I.   BACKGROUND

Fruit Jobbers was incorporated in Mississippi and licensed as a dealer of perishable agricultural commodities by the United States Department of Agriculture (USDA), pursuant to the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. § 499 et seq.  Its office was in Jackson, Mississippi.  David L. Hawkins (Hawkins) began working at Fruit Jobbers in 1950.  He became a shareholder in 1960, at which time he also became vice-president of the corporation.  Eventually, Hawkins was a member of the board of directors.  From the time he became a shareholder until August 1988, Hawkins received a salary and monthly stock dividends from Fruit Jobbers.

In August 1988, members of the Harrison family purchased approximately 78 percent of Fruit Jobbers' stock.  At that time, Harrison held approximately 22 percent of the stock.  Following their purchase of the stock, the Harrison family removed Hawkins as an officer and a member of the board of directors.  They also offered to purchase Hawkins' shares for the same price as they had purchased shares from other shareholders if Hawkins would sign a non-competition agreement, effective for five years and within a 150-mile radius of Jackson, Mississippi.  Hawkins refused to sell his stock on those terms and resigned all positions and offices that he held with Fruit Jobbers on August 3, 1988.  He received no salary or stock dividends from Fruit Jobbers after that date.  He did, however, maintain his stock holdings.  Hawkins subsequently went to work at D&D Produce,

Hawkins' own produce business licensed under the PACA, and at Capitol City Produce as a buyer.

On July 7, 1989, Hawkins filed suit in the Chancery Court of Hinds County, Mississippi, against Fruit Jobbers and the Harrison family to force them to provide documentation of Fruit Jobbers' financial affairs. In the alternative, Hawkins petitioned the court to compel the Harrison family to buy his stock, or for the court to close the business and distribute the assets.

On February 1, 1990, before the chancery court litigation was completed, Fruit Jobbers filed a bankruptcy petition in federal district court seeking relief pursuant to Chapter 11 of the Bankruptcy Code. The bankruptcy petition did not list Hawkins as a shareholder, even though he still owned approximately 22 percent of Fruit Jobbers' stock.

The Director of the Fruit and Vegetable Division of the Agricultural Marketing Service (AMS) of the USDA filed an administrative complaint against Fruit Jobbers on August 31, 1990, alleging that during the period from July 1989 through February 1990, Fruit Jobbers purchased, received, and accepted-- in interstate commerce--117 lots of perishable agricultural commodities but failed to make full payment promptly of the agreed purchase prices, which totaled $324,246.87. Thus, Fruit Jobbers was alleged to have violated 7 U.S.C. § 499b(4).[1]

---

[1] Section 499b(4) states in pertinent part that it is unlawful
   [f]or any commission merchant, dealer, or broker to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving

Shortly thereafter, the AMS notified Hawkins that because he owned approximately 22 percent of Fruit Jobbers' stock when the corporation allegedly violated PACA provisions, he was determined to be "responsibly connected" with the corporation pursuant to 7 U.S.C. § 499a(b)(9).  Hawkins then filed a petition for review of the AMS decision.  On December 20, 1990, the AMS referred Hawkins' petition to the presiding officer.

An administrative law judge issued a default order against Fruit Jobbers on January 11, 1991, finding that Fruit Jobbers had committed willful, flagrant, and repeated violations of 7 U.S.C. § 499b and that therefore Fruit Jobbers' license would be revoked pursuant to 7 U.S.C. § 499h.  That order became final on February 27, 1991.

A hearing concerning Hawkins' "responsible connection" to Fruit Jobbers was held in Jackson, Mississippi, on July 16, 1991, before the presiding officer.  The presiding officer issued his decision on May 11, 1992, in which he found Hawkins "responsibly connected" with Fruit Jobbers when Fruit Jobbers committed PACA violations because Hawkins was a holder of more than ten percent

---

any perishable agricultural commodity which is received in interstate or foreign commerce by such commission merchant, or bought or sold, or contracted to be bought, sold, or consigned, in such commerce by such dealer, or the purchase or sale of which in such commerce is negotiated by such broker; or to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had; or to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction . . . .

4

of Fruit Jobbers' stock during that time. Hawkins thus became subject to the PACA's employment restrictions,[2] which mandate that Hawkins is barred from employment by any PACA licensee for a minimum period of one year. The administrator of the AMS affirmed the presiding officer's decision on November 9, 1992. Hawkins now seeks review of the administrator's final order.

II.  STANDARD OF REVIEW

This court upholds an agency's decision unless we determine it to be arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A). We uphold an agency's factual findings if they are supported by substantial evidence. Faour v. United States Dep't of Agric., 985 F.2d 217 (5th Cir. 1993) (citing Federal Trade Comm'n v. Indiana Fed'n of Dentists, 476 U.S. 447, 454 (1986)). The substantial evidence standard requires only

---

[2] Section 499h(b) states in pertinent part:
[N]o licensee shall employ any person, or any person who is or has been responsibly connected with any person--
    (1) whose license has been revoked or is currently suspended by order of the Secretary;
    (2) who has been found after notice and opportunity for hearing to have committed any flagrant or repeated violation of section 499b of this title
    . . . .
The Secretary may approve such employment at any time following nonpayment of a reparation award, or after one year following the revocation of finding of flagrant or repeated violation of section 499b of this title, if the licensee furnishes and maintains surety bond in form and amount satisfactory to the Secretary as assurance that such licensee's business will be conducted in accordance with this chapter. . . . The Secretary may approve employment without a surety bond after the expiration of two years from the effective date of the applicable disciplinary order.

5

that an agency decision be supported by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Legal issues, however, are "'for the courts to resolve, although even in considering such issues the courts are to give some deference to the [agency's] informed judgment.'" Faour, 985 F.2d at 219 (quoting Federal Trade Comm'n, 476 U.S. at 454). Our review of an agency's construction of a statute must give effect to the unambiguously expressed intent of Congress. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984).


## III. DISCUSSION

Hawkins first asserts that the presiding officer erred in applying a per se standard in determining whether Hawkins was "responsibly connected" with Fruit Jobbers and not considering evidence which demonstrated that Hawkins was not in fact responsible for any of Fruit Jobbers' PACA violations. Hawkins further asserts that the per se analysis used by the presiding officer violates Hawkins' right to equal protection under the law, as guaranteed by the Fifth Amendment, and that any employment sanctions imposed upon him as a result of the presiding officer's decision violate his Fifth Amendment due process rights. He also contends that the presiding officer's

6

decision reflecting Fruit Jobbers' flagrant or repeated PACA violations is not supported in the record by substantial evidence.  We address each of Hawkins' contentions in turn.

## A. "Responsibly Connected"

Hawkins first contends that the presiding officer erred in applying a per se analysis to § 499a(b)(9), which defines "responsibly connected."  Instead, according to Hawkins, the presiding officer should have construed the language of § 499a(b)(9) as a "rebuttable presumption" to afford a person falling within one of the categories delineated therein to demonstrate that he was not actually responsibly connected to the offending corporate licensee.

Hawkins argues, in essence, for an interpretation under which a person would be presumed "responsibly connected" if he fits into any of the three categories listed in § 499a(b)(9), but would be allowed to rebut this presumption by proving that his position was a nominal one.  Thus, Hawkins argues that because he was a minority shareholder and had resigned all of his positions with Fruit Jobbers before the alleged violations occurred, receiving no economic benefit from Fruit Jobbers and taking no effective part whatsoever in the control of the corporation, he was not "responsibly connected" to Fruit Jobbers.

Section 499a(b)(9) defines "responsibly connected" as

affiliated or connected with a commission merchant, dealer, or broker as (A) partner in a partnership, or (B) officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association.

7

In _Faour_, 985 F.2d at 219-21, a panel of this court was presented with the precise issue Hawkins now raises.  In determining whether § 499a(b)(9) fostered an interpretation which reads a "rebuttable presumption" into the statute, this Court stated:

> We find the plain meaning of this statute unambiguous.  If a person is an officer or director of, _or holds over ten percent of the outstanding stock_ of, a corporation that has been found to have committed any flagrant or repeated violation of section 499b, that person is considered "responsibly connected" and subject to sanctions under PACA.  The statute is explicit:  If a person falls within one of the three enumerated categories, he is responsibly connected. The statute does not contemplate a defense that allows a person to show that even though he fits into one of the three categories, he never had enough actual authority to be considered truly responsibly connected.

_Faour_, 985 F.2d at 220 (emphasis added).  We thus disagreed with the District of Columbia Circuit's interpretation of § 499a(b)(9) as reading a rebuttable presumption into the statute, and instead we joined other Circuits that had adopted the _per se_ rule, which we determined the plain language of § 499a(b)(9) commands.  _Id._ at 220-21; _see_ _Pupillo v. United States_, 755 F.2d 638, 643 (8th Cir. 1985); _Birkenfield v. United States_, 369 F.2d 491, 494 (3d Cir. 1966); _see also_ _Zwick v. Freeman_, 373 F.2d 110, 119 (2d Cir.) (citing with approval the _per se_ standard enunciated in _Birkenfield_), _cert. denied_, 389 U.S. 835 (1967).  We saw no reason to look beyond the unambiguous language of the statute, for we determined that this language shows that Congress intended for any person who falls into one of the designated categories to be deemed "responsibly connected."  _Faour_, 985 F.2d at 221.

Hawkins contends, however, that his situation is different from that of the petitioner in Faour. Gary K. Faour was the manager for institutional sales, a director, and an officer of the Magnolia Fruit & Vegetable Company at the time it violated the PACA--from August through December of 1987. Id. at 218. Although at one time he had owned 27.27 percent of the company's stock, in 1986 he owned only 10.5 percent, which he had pledged as collateral for a loan for the company. Id. Whether Faour owned more than 10 percent of the stock at the time of the alleged violations was not a factor in this court's determination that Faour was "responsibly connected" because we found that Faour was a vice-president and director of the company when it violated the PACA. Id. at 221-22. Hawkins therefore argues that in Faour we did not apply the per se rule in a case involving only a minority stockholder and that Faour is thus distinguishable from the instant case.

To strengthen his position, Hawkins points out that he tried to sell his stock to the Harrison family but that they refused to buy it unless he would sign a non-competition agreement, effective for five years within a 150-mile radius of Jackson, Mississippi. He also notes that his stock was "valueless" because he was barred by the Harrison family, who controlled the corporation, from ascertaining the value of his stock. He further maintains that because he was unable to readily determine his stock's value, his stock did not represent a bona fide stake in the corporation but instead had been rendered useless.

Additionally, he explains that his refusal to sell his stock for the price offered by the Harrison family was not unreasonable because the non-competition agreement that was part of the proposed sale would have essentially forced him to give up "his ability to enjoy a livelihood in a field in which he had decades of unblemished experience."

We are unconvinced by Hawkins' arguments.  First, our decision in Faour primarily focused not on Faour's status as a corporate officer, but on the unambiguous language of § 499a(b)(9) and our recognition that in drafting the statute, Congress intended to provide a clear definition of "responsibly connected."[3]  Faour, 985 F.2d at 221.  Hawkins' attempt to distinguish Faour on grounds that Hawkins is a stockholder instead of a corporate officer is thus misplaced.

Second, the PACA was enacted in 1930 and significantly amended in 1956 and 1962.  Any dealer, merchant, broker, or investor in perishable commodities must recognize that the PACA is, as it has been for years, a "tough law."  As Congress explained,

---

[3] In a 1962 amendment to the PACA, Congress defined the term "responsibly connected" in order to "[i]mprove and clarify provisions dealing with the eligibility for license, or for employment by licensees, of persons guilty of specified acts and persons affiliated with them."  H. Rep. No. 1546, 87th Cong., 2d Sess. (1962), reprinted in 1962 U.S.C.C.A.N. 2749, 2750.  The House Report states that Congress believed this definition would "give [the term 'responsibly connected'] specific meaning, thus avoiding possible confusion as to interpretations."  Id. at 2751. The Report also made it clear that "responsible connection" could be established under the amendment without showing that the person "was responsible in whole or in part" for the conduct that violated the statute.  Id. at 2753.

10

> [t]he [PACA] . . . was enacted in 1930 for the purpose
> of providing a measure of control and regulation over a
> branch of industry which is engaged almost exclusively
> in interstate commerce, which is highly competitive,
> and in which the opportunities for sharp practices,
> irresponsible business conduct, and unfair methods are
> numerous.  The law was designed primarily for the
> protection of producers of perishable agricultural
> products--most of whom must entrust their products to a
> buyer or commission merchant who may be thousands of
> miles away, and depend for their payment upon his
> business acumen and fair dealing--and for the
> protection of consumers who frequently have no more
> than the oral representation of the dealer that the
> product they buy is of the grade and quality they are
> paying for.
>      The law has fostered an admirable degree of
> dependability and fairness in this industry chiefly
> through the method of requiring the [licensing] of all
> those who carry on an interstate business in perishable
> agricultural commodities and denying this [license] to
> those whose business tactics disqualify them.

H.R. Rep. No. 1196, 84th Cong., 1st Sess. (1956), reprinted in

1956 U.S.C.C.A.N. 3699, 3701.  Thus, any investor in a perishable

commodities corporation should know at the beginning of his

association with such a corporation that he is "buying into" a

corporation which is strictly regulated by the federal government

through the PACA.  That Hawkins was not given the opportunity to

sell his stock to the corporation on more favorable terms is

unfortunate, but as a veteran of the perishable commodities

business for more than thirty years, Hawkins was aware of the

"toughness" of the PACA and the risk he took when he became a

shareholder in Fruit Jobbers.

Hawkins admits that he owned approximately 22 percent of the

stock in Fruit Jobbers at the time the PACA violations occurred.

Our decision in Faour will thus be dispositive of Hawkins' claim

concerning the application of the per se rule to the

11

interpretation of § 499a(b)(9) unless we determine that such an interpretation violates Hawkins' equal protection rights or that employment restrictions imposed upon him pursuant to § 499h as a result of his being deemed "responsibly connected" violate his due process rights, as Hawkins contends. It is to those issues, which were not raised in Faour, that we now turn.

B.   Equal Protection and Due Process

Hawkins first contends that because the District of Columbia Circuit has determined that § 499a(b)(9) should be read to permit a rebuttable presumption, any other interpretation--i.e., the application of the per se rule--would treat him differently than others similarly situated and thus violate his right to equal protection under the law. Hawkins also contends that the per se standard renders the statute constitutionally infirm as applied because it violates his right to due process. In support of this contention, Hawkins asserts that the hearing afforded him was "not meaningful," i.e., he was not given a fair opportunity to "rebut" the statutory presumption. Hawkins also asserts that the statute sweeps so broadly that it includes within its ambit presumptions "not necessarily or universally true in fact" and that reasonable alternative means exist by which the government can make critical determinations of which persons were "responsibly connected" to a corporation which violates the PACA. We address each of his arguments in turn.

12

## 1. *Equal Protection*

The basis of Hawkins' equal protection claim is that the presiding officer's and this court's rejection of the "rebuttable presumption" approach in interpreting § 499a(b)(9), an approach which was taken by the District of Columbia Circuit, in favor of the per se rule which we see as commanded by the plain language of the statute, violates his right to equal protection under the law. Thus, Hawkins suggests that a difference of opinion among the circuits or a circuit split violates such a right. Although we find Hawkins' argument a novel one, we disagree. A disagreement between circuits on the interpretation of a statute is a matter which either the Supreme Court or Congress should resolve; it does not violate the equal protection rights of the person subjected to the "more burdensome interpretation." United States v. Palacio, 4 F.3d 150, 154 (2d Cir. 1993). We thus find Hawkins' equal protection argument to be without merit.

## 2. *Due Process*

### a. Arbitrary Governmental Interference

Hawkins also argues that the application of the per se rule to § 499a(b)(9) violates his Fifth Amendment due process rights because it unreasonably subjects him to the employment restriction provisions of § 499h and thus arbitrarily interferes with his right to engage in his chosen profession. He cites specifically to Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632 (1974), and to cases cited within Cleveland for the proposition that "permanent irrebuttable presumptions have long been

13

disfavored under the Due Process Clause of the Fifth Amendment and Fourteenth Amendments" because the Due Process Clause requires "a more individualized determination." Id. at 645-46 (internal quotations and citations omitted).

In Cleveland, the Supreme Court held that mandatory maternity leave provisions set forth by the Cleveland Board of Education violated pregnant teachers' due process rights because they created "irrebuttable presumptions" that every teacher who was four months pregnant was physically incapable of continuing her duties. Id. at 643-48. These provisions required a pregnant teacher to take maternity leave without pay, beginning five months before the expected birth of her child. Id. at 634. The Court explained that a pregnant teacher's ability to continue teaching past a fixed pregnancy period was an individual matter and that the presumption embodied in the challenged provisions-- which did foster administrative convenience--were not "universally true in fact" and that thus the provisions swept too broadly. Id. at 646-68. After recognizing that freedom of personal choice in matters of marriage and family life had been long recognized as being one of the fundamental liberties protected by the Due Process Clause, id. at 639, the Court concluded that "neither the necessity for continuity of instruction nor the [governmental] interest in keeping physically unfit teachers out of the classroom can justify the sweeping mandatory leave regulations that the . . . School Board[] ha[s] adopted," id. at 647-48. The Court therefore invalidated the

14

challenged provisions because "they employ irrebuttable presumptions that unduly penalize a female teacher for deciding to bear a child."  Id. at 648.

We find Hawkins' reliance on Cleveland and cases cited within Cleveland as misplaced for several reasons.  First, Cleveland was the last of a line of cases in which the Supreme Court "ventured into 'irrebuttable presumptions' analysis, purportedly an aspect of procedural due process but in substance similar to very intensive scrutiny of legislative generalizations."  GERALD GUNTHER, CONSTITUTIONAL LAW 876 (12th ed. 1991).  Shortly after its decision in Cleveland, the Court made it clear that a type of heightened scrutiny of a statute or regulation could not be triggered by merely asserting a claim that the challenged statute or regulation contained an "irrebuttable presumption."  See Weinberger v. Salfi, 422 U.S. 749, 777 (1975).  In Salfi, which involved a challenge to a duration-of-relationship requirement for Social Security eligibility for surviving wives and stepchildren of deceased wage earners, the Court explained that

> the question . . . is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. . . . Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than nonmembers.  The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual

15

determinations justified the inherent imprecision of a prophylactic rule.

Salfi, 422 U.S. at 777 (emphasis added).  The Court then distinguished Cleveland and other cases in the "irrebuttable presumption" line--e.g., Vlandis v. Kline, 412 U.S. 441 (1973), in which a residency requirement for in-state tuition was being challenged and which arguably involved a student's right to engage in interstate travel, and Bell v. Burson, 402 U.S. 535 (1971), in which the Court found the state's making a driver's liability for an auto accident an important factor for denying his driver's license incompatible with the application of the challenged statute, which required a driver to post bond to cover damages allegedly arising from an auto accident or face suspension of his driver's license, without an opportunity to rebut his alleged liability.  Id. at 772.  The Court saw this line of cases as either involving interests which had "constitutionally protected status," id. at 771-72, or involving an only purported governmental interest in the statute or regulation at issue, id. at 772.

Most commentators view the Salfi decision as definitively having repudiated the "irrebuttable presumption" analysis as a generally acceptable mode of analysis in a constitutional challenge to a statute or regulation.  See, e.g., GUNTHER, at 877 (noting that the Salfi decision was a "death blow" to the "irrebuttable presumption" line of cases); LAURENCE H. TRIBE, CONSTITUTIONAL LAW § 16-34, at 1622-24 (2d ed. 1988) (discussing that with Salfi the Court severely limited the situations in

16

which the irrebuttable presumption analysis might apply to those in which "intermediate or strict scrutiny was independently warranted either by the involvement of a sensitive classification or by the presence of an important liberty or benefit"); D. Michael Risinger, "Substance" and "Procedure" Revisited with Some Afterthoughts on the Constitutional Problems of "Irrebuttable Presumptions", 30 UCLA L. REV. 189, 215 (1982) (explaining that the Salfi decision expressly returned the standard of review to "rational basis"). Thus, Hawkins' promotion of an "irrebuttable presumption" analysis as the type of analysis necessary in the instant case is misguided.

Second, we emphasize that the Constitution does not guarantee an unrestricted privilege to engage in a particular profession or a privilege to conduct a business as one pleases. Nebbia v. People of State of New York, 291 U.S. 502, 527-28 (1934). Moreover, the perishable commodities industry, as an instrument of interstate commerce, is certainly an industry which for more than fifty years has been subject to reasonable congressional regulation. Courts have thus reviewed the constitutionality of various sections of the PACA using a "rational basis" analysis.

For example, in Zwick v. Freeman, 373 F.2d 110 (2d Cir.), cert. denied, 389 U.S. 835 (1967), the court reviewed a petitioner's claim that the harsh employment restrictions embodied in § 499h for those persons deemed "responsibly connected" under § 499a(b)(9) violated his due process rights "to

17

earn a livelihood in the common occupations of the community."
Id. at 118.  After citing the Supreme Court's decision in Nebbia
for the proposition that the petitioner did not have a
constitutional guarantee for an unrestricted privilege to engage
in his chosen occupation, the court determined that the
employment restrictions of § 499h, although harsh in some cases,
were "reasonably designed to achieve the desired Congressional
purpose."  Id.  The court thus upheld these harsh employment
restrictions against the petitioner's due process challenge.  Id.
at 119; see also George Steinberg & Son, Inc. v. Butz, 491 F.2d
988, 994 (2d Cir.) (agreeing with the Zwick court's determination
that PACA's harsh restriction upon the employment of any person
"responsibly connected" to a licensee found to have violated the
PACA did not violate the Due Process Clause of the Fifth
Amendment), cert. denied, 419 U.S. 830 (1974).

Likewise, the Third Circuit used a rational basis analysis
in Birkenfield v. United States, 369 F.2d 491, 494-95 (3d Cir.
1966), to determine that the per se standard which Congress
adopted in its 1962 amendment of § 499a(b)(9) was constitutional
and not violative of the petitioner's right to due process.  The
court first looked at the object of the PACA as being to suppress
unfair and fraudulent practices in the industry and thus protect
producers of perishable commodities.  Id. at 494.  After
examining the 1962 amendments to the PACA and Congress' reason
for defining "responsibly connected" as it had in amending the
statute, i.e., the previous difficulty in ascertaining the true

18

nature of an employee's relationship with the licensee corporation, the court explained that

> [t]he automatic exclusion of "responsibly connected" persons is not irrational or arbitrary under the circumstances. Surely, the relationships of director, officer or substantial shareholder form a sufficient nexus for the arbitrary conclusion of responsible connection. Moreover, the formation of such relationships with the sanctioned company is a voluntary act. The fact that an individual has not exercised "real" authority in the sanctioned company is not controlling: certainly the individual could have resigned as an officer and director [or] disposed of his stock. It was his free choice not to do so. Having made that choice, the appellant assumed the burdens imposed by the Act.

Id. at 494-95. The court then upheld the per se exclusionary standard of § 499a(b)(9) as constitutional. Id. at 495.

We therefore cannot say that the unambiguous language of § 499a(b)(9), which in Faour we determined commands the application of the per se rule, was irrationally conceived or arbitrary in effecting a legitimate governmental objective, i.e., the protection of producers of perishable agricultural products. We also agree that the status of being a director, officer, or substantial shareholder in a perishable commodities corporation forms a "sufficient nexus" to the corporation so that a person of such status can be deemed "responsibly connected" and thus held to the strict provisions of the PACA, including employment sanctions.[4] See Faour, 985 F.2d at 220 (citing Birkenfield, 369

---

[4] Additionally, as we noted earlier, the attainment of such a status with a perishable commodities corporation is a completely voluntary act. We thus agree with the Birkenfield court that once an individual chooses to attain such a status, he assumes not only the benefits of that status but also the burdens of the PACA.

19

F.2d at 494). We thus cannot see how the per se rule of § 499a(b)(9), which can subject to employment restrictions under § 499h those persons "responsibly connected" to a corporation which has flagrantly or repeatedly violated the PACA, unconstitutionally encroaches upon Hawkins' due process rights by arbitrarily interfering with his chosen profession.

### b. Scope of Hearing

Hawkins also maintains that his due process rights were violated because he was deprived of a "meaningful hearing" in which to rebut the presumption of fault which § 499a(b)(9) imposes upon him by making him subject to the employment restrictions of § 499h if he falls into one of the delineated categories of § 499a(b)(9). In light of our above discussion, see Part III.B.1 supra, we find that Hawkins was not entitled to a hearing so that he might rebut the "responsibly connected" presumption embodied in § 499a(b)(9). He was entitled, however, to an opportunity to show that at the time Fruit Jobbers allegedly violated the PACA, he did not fall into one of the three categories delineated in § 499a(b)(9). Because he was afforded such an opportunity, his due process rights were not violated. His argument with respect to being denied a meaningful hearing is thus without merit.

### C. Substantial Evidence

Hawkins finally contends that the presiding officer's decision reflecting Fruit Jobbers' flagrant or repeated PACA

20

violations is not supported in the record by substantial evidence. We disagree.

In making his determination, the presiding officer relied on an administrative law judge's default order finding Fruit Jobbers to have committed willful, repeated, and flagrant violations of the PACA by failing to make full payment promptly of $324,246.87 to 50 sellers for 117 lots of fruits and vegetables. See In re Fruit Jobbers, 50 Agric. Dec. 1100 (1991). Although served with a complaint issued by the Department of Agriculture, Fruit Jobbers never responded to deny the allegations. Id. After the time for filing an answer had expired and upon the motion of the Department of Agriculture, the judge issued a default order pursuant to 7 C.F.R. § 1.139, finding that Fruit Jobbers had committed willful, flagrant, and repeated violations of PACA. Id. Regulations governing PACA proceedings provide that "[f]ailure to file an answer within the time prescribed shall constitute a waiver of hearing and an admission of the facts alleged in the complaint." 7 C.F.R. § 47.8(c). The default order became final on February 27, 1991--before Hawkins' hearing before the presiding officer. Thus, the presiding officer's reliance on the administrative law judge's findings fully supports his conclusion that Fruit Jobbers violated the PACA. Hawkins' claim concerning the lack of substantial evidence is without merit.

21

## IV. CONCLUSION

For the foregoing reasons, we DENY the petition for review and AFFIRM the administrator's order.

DeMOSS, Circuit Judge, specially concurring.

I concur in the reasoning and result of Judge King's well-crafted opinion. We have simply said that the law is what Congress says is the law. However, on rare occasions, in the words of Mr. Bumble in Charles Dickens' *Oliver Twist,* "...the law is a[n] ass," and this is one of those occasions. To say that a person is "responsibly connected" to an action of a corporation simply by reason of being a minority shareholder of that corporation, flies in the face of both logic and reality. I always thought it was hornbook law that a shareholder, even a majority shareholder, was not responsible for the debts or torts or criminal conduct of a corporation, simply by reason of being such shareholder. If the public policy behind PACA (as indicated by the quotation from the House Report in Judge King's opinion) is to require licensing for those who carry on a business in perishable agricultural commodities, and to deny such licenses "to those whose business tactics disqualify them," should not the law focus on the perpetrators of the unacceptable business tactics? If not, the innocent investor/shareholder is branded with guilt purely on the basis of association, a circumstance

22

which I thought was clearly not acceptable as a basis for fixing responsibility.  Consequently, I write this special concurrence with the hope that somewhere in the Department of Agriculture there is an administrator of this Act with the courage to suggest to Congress that the definition of "responsibly connected" should be amended by deleting the words "holder of more than 10 percent of the outstanding stock of a corporation."