Jean–Pierre BELL, Petitioner,

v.

DEPARTMENT OF AGRICULTURE;
United States of America,
Respondents.

No. 93–1303.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1994.

Decided Nov. 15, 1994.

Stephen P. McCarron, Washington, DC, argued the cause and filed the briefs, for appellant.

Stephen M. Reilly, Atty., U.S. Dept. of Agriculture, Washington, DC, argued the cause for respondents. With him on the brief were James Michael Kelly, Associate Gen. Counsel, and Raymond W. Fullerton, Asst. Gen. Counsel, U.S. Dept. of Agriculture, Washington, DC.

Before: WALD, WILLIAMS and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Petitioner Jean–Pierre Bell seeks review of a final order issued by the Department of Agriculture, in which he was found to have been "responsibly connected" with Sunrise Produce, an agricultural products marketing company that violated the Perishable Agricultural Commodities Act of 1930, 7 U.S.C. § 499a *et seq.* (1988). Because we find that the Department erroneously applied a *per se* standard to find Bell "responsibly connected" to Sunrise, we remand the case to the Department for further proceedings consistent with this opinion.

\*     \*     \*

The Perishable Agricultural Commodities Act ("PACA") requires merchants of fresh fruits and vegetables to obtain a license from the Department of Agriculture. 7 U.S.C. §§ 499a(4), 499c (1988). PACA makes it unlawful for licensees to fail or refuse to "make full payment promptly" for such products, *id.* § 499b(4), and allows the Secretary to revoke the license of those guilty of "flagrant or repeated" violations. *Id.* § 499h(a).

Furthermore, no licensee may employ a person who has been "responsibly connected" with such a violator, *id.* § 499h(b), and PACA defines a person as "responsibly connected" with a licensee if he or she is "affiliated" with the licensee "as (A) partner in a partnership, or (B) officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association." *Id.* § 499a(9). Thus, when the Secretary revokes a license, he bars persons responsibly connected with the violator from employment in the industry for at least one year, whether or not they participated personally in the violation. *Martino v. United States Dept. of Agriculture,* 801 F.2d 1410, 1411 (D.C.Cir. 1986).

In 1979 Bell left his job as a restaurant chef and went to work as a produce salesman at Sunrise Produce, a District of Columbia corporation and a PACA licensee. Sunrise's then owners, Dan Stalling and Jerry Rock, hired Bell because of his expertise in produce and his contacts in the restaurant world. When conflicts later began to arise between the owners, they appointed Bell as president of Sunrise so that he might mediate their disputes.

In 1983 or 1984 William Mailley, Jr. bought Rock's share of Sunrise and, soon thereafter, Stalling's. Mailley became president and made Bell the vice-president. Whatever Bell's duties under Stalling and Rock, he performed none under Mailley that can be specifically attributed to his being vice-president. He never signed checks or agreements; he never filed PACA license renewals; he had no access to Sunrise books or records. He just sold produce.

After Mailley assumed control of the company, Bell occasionally heard talk "on the street" that Sunrise had "some outstanding debt". As one of his friends from another company told him, "the tab was pretty big." Joint Appendix ("J.A.") 84. On Bell's inquiry, Mailley said that he owed "quite a bit of money on the street and slowly slowly he was paying off those old debts from the two previous owners." J.A. 84–85. On some later occasions, while handling the office phone for the convenience of Mailley, Bell heard that some of the company's checks had bounced.

In March 1988, Bell quit his job at Sunrise after a spat with Mailley. A few days later, he returned to work on the condition—according to his and Mailley's later testimony—that he not resume his title as vice-president, because he wanted to be "just . . . an employee." J.A. 86, 104. Mailley testified that he never made the change on paper, however, because "[Bell's] title . . . didn't mean anything anyway. So it didn't matter whether I changed anything or not to myself anyway because he really didn't have any say so in what was going on anyway." J.A. 104.

At some point Mailley elected Bell a director of Sunrise. Minutes of the annual shareholders' meeting, attended only by Mailley as sole shareholder, show Bell elected to the board on April 6, 1988 and re-elected on April 6, 1989. As there were no directors' meetings, Bell attended none. In 1988 and 1989, however, he signed waivers of notice of such meetings. Purported minutes of the annual directors' meetings in those years record his election as vice-president. During the period of the violations, Mailley listed Bell on the PACA license as vice-president and director of the corporation.

Between November 1988 and February 1990, Sunrise committed the violations giving rise to revocation of its license. It purchased 775 lots of perishable agricultural commodities from 28 sellers, for over $600,000, and failed to make full payment of the agreed purchase prices. The Department issued an administrative complaint against Sunrise under PACA and on December 23, 1991 entered a default finding of willful, flagrant, and repeated violations of the Act.

Because of the documents listing Bell as an officer and director of Sunrise, the PACA Branch of the Department's Fruit and Vegetable Division notified Bell that it might find

him responsibly connected to Sunrise. Bell contested the classification. After a hearing, a departmental "Presiding Officer" found Bell responsibly connected during the relevant period. He relied on Bell's being listed as vice-president and director on various forms and corporate records, and on the lack of any evidence that Mailley had ever initiated formal action to remove him as an officer. Bell petitioned for review within the Department. The Acting Administrator of the Agricultural Marketing Service affirmed, and Bell seeks review here pursuant to 28 U.S.C. § 2342 (1988).

\* \* \*

In this circuit, we have consistently read §§ 499a(9) and 499h(b) as establishing only a rebuttable presumption that an officer, director, or major shareholder of a PACA violator is responsibly connected to the violator. See, e.g., *Veg–Mix, Inc. v. United States Department of Agriculture*, 832 F.2d 601, 611 (D.C.Cir.1987); *Minotto v. United States Department of Agriculture*, 711 F.2d 406, 408 (D.C.Cir.1983); *Quinn v. Butz*, 510 F.2d 743, 756 (D.C.Cir.1975). Other circuits have read § 499a(9) as establishing a flat *per se* rule. The gulf may not be so great as the difference in terminology suggests, though, for the other circuits' decisions construing the phrase "responsibly connected" have all involved persons holding more than 10% of the corporation's shares, where a finding that the relationship was nominal would be more difficult. *Hawkins v. Agricultural Marketing Service*, 10 F.3d 1125 (5th Cir.1993); *Faour v. United States Department of Agriculture*, 985 F.2d 217 (5th Cir.1993); *Pupillo v. United States*, 755 F.2d 638 (8th Cir.1985); *Birk-*

*enfield v. United States*, 369 F.2d 491 (3d Cir.1966).

We have identified two sets of circumstances under which a petitioner may rebut the presumption that he is responsibly connected with a corporate violator because he is an officer, director, or major shareholder. The first involves cases in which the violator, although formally a corporation, is essentially an alter ego of its owners, so dominated as "to negate its separate personality." *Quinn*, 510 F.2d at 758. Thus, in *Quinn*, we indicated that an officer might meet this test by showing that the sole stockholder of the corporation " 'effectively retained the decision making power in all aspects of corporate decision making,' " *id.* at 757, so that the company was not really a corporation within the meaning of 7 U.S.C. § 499a(9), but rather a sole proprietorship. *Quinn* did not specify what powers a sole shareholder would have to exercise, beyond those that normally attend sole ownership, for the corporation to constitute an alter ego.

The second way of rebutting the presumption is for the petitioner to prove that at the time of the violations he was only a *nominal* officer, director, or shareholder. This he could establish by proving that he lacked "an actual, significant nexus with the violating company." *Minotto*, 711 F.2d at 409. Where responsibility was not based on the individual's "personal fault", *id.* at 408, it would have to be based at least on his "failure to 'counteract or obviate the fault of others' ", *id.*[1]

\* \* \*

---

[1] We cannot see any statutory warrant for the view expressed in the Department's brief that the power to counteract or obviate might flow from the individual's being a "key" employee. Respondent's Brief at 30. See also *id.* at 39 ("Bell's significant nexus to Sunrise was on the sales side.") Under some other statutes administered by the Department, such as the Federal Meat Inspection Act, 21 U.S.C. § 601 *et seq.* (1988), a person is "responsibly connected with the business if he was a partner, officer, director, holder, or owner of 10 per centum or more of its voting stock or *employee in a managerial or executive capacity.*" *Id.* § 671 (emphasis added). PACA does not similarly try to punish "key" employees; the language of the statute instead focuses on

officership, directorship, or ownership of a major block of stock as the nexus from which authority must flow. Thus in *Quinn*, we did not consider how valuable Carl Quinn was to DeVita Fruit Company as a buyer and seller, see *Quinn*, 510 F.2d at 747 (reciting Quinn's activities), or how much influence he might have wielded over the company by threatening to withdraw as buyer and seller. Rather, we looked to such matters as whether he was "assigned duties or paid additional salary *as* vice-president ... [or] perform[ed] services *as* vice-president", *id.* at 752 (emphasis added), and thus (indirectly) to his ability in that capacity to "counteract" the fault of others.

■ The Presiding Officer paid little heed to circuit law on nominal officers and directors. He recited that Bell had remained an officer after the end of his role mediating between two owners of Sunrise and that, despite Bell's request to be removed as vice-president, there was "no evidence to show that such action was initiated." J.A. 20. He also said that the record "support[ed] the conclusion that [Bell] was neither enticed nor coerced into being an officer of Sunrise." *Id.* As to the directorship, the Presiding Officer noticed corporate records indicating that Bell was a director, "records that he acknowledged signing". *Id.*

These findings are quite consistent with a conclusion that Bell's officership and directorship were nominal within the meaning of *Quinn* and *Minotto.* Quinn was indisputably a vice-president on paper. After the sole proprietorship for which he worked was incorporated, he became its vice-president, but his duties did not change, he was paid no additional salary, and he never had anything to do with policy or business decisions. Nor did he have access to company records or any knowledge of the company's financial difficulties. We said that these circumstances "would demonstrate not only that Quinn did not to any extent participate in the management of the company's affairs, but also that he was totally without power to do so; in other words, that Quinn did not bear any responsible connection with the company." *Quinn,* 510 F.2d at 753. Although *Quinn* may be distinguishable because of Bell's apparent awareness of some company financial difficulties, the decision makes clear that an officer may be "nominal" even though the corporate records, such as those relied on here by the Presiding Officer, make him out to be a real one.

So too for directors. Lilly Minotto, a clerical employee of a PACA licensee, was put on its board of directors because she was always in the office and could be counted on to attend meetings and ensure a quorum. She actually attended all nine board meetings held during the four years she was a director and voted in favor of all resolutions proposed. We held that the "fact that Minotto was an uncompensated, nominal director who attended Board meetings at the request of her employer does not support the conclusion that she was 'responsibly connected' to the violating company within the meaning of the Act." *Minotto,* 711 F.2d at 409. That we held her not to be responsibly connected, however, makes it clear that one may hold a paper directorship, and more, and yet be classified as nominal.

In noting that Bell was "neither enticed nor coerced" into being an officer of Sunrise, J.A. 20, the Presiding Officer picked up dicta from our decision in *Martino,* purporting to distinguish *Quinn* and *Minotto.* There, considering two persons who each had held 22.2% of the shares in a PACA licensee, the court said,

> unlike Quinn and Minotto, neither [petitioner] was enticed or coerced by an employer into the position that renders him "responsibly connected." Absent inveiglement of that sort, "[s]urely[ ] the relationships of director, officer or substantial shareholder form a sufficient nexus for the arbitrary conclusion of responsible connection."

801 F.2d at 1414 (quoting *Birkenfield,* 369 F.2d at 494). In fact, though, *Quinn* and *Minotto* are devoid of evidence of enticement, coercion or inveiglement, except in the vague sense that employees will typically wish to please their employers. Although such pressures obviously may be *relevant* to a finding of "nominal" responsible connection, they are not necessary. Moreover, we note that because *Martino* involved substantial shareholders, the likelihood of their being found "nominal" was remote. Cf. *Hawkins,* 10 F.3d at 1127 (minority shareholder, effectively trapped in close corporation by majority's conditioning buy-out offer on highly restrictive covenant not to compete, claims he was nominal shareholder); *id.* at 1135 (viewing *per se* application of § 499a(9) in such circumstances as instance where "the law is a[n] ass") (DeMoss, J., concurring).

As the Presiding Officer's analysis does not even address the issues raised by our precedents, we remand the case for further consideration. In doing so, we note the following unresolved questions.

\* \* \*

*Bell's Resignation.* Bell testified that he resigned his position, at least as vice-presi-

dent and perhaps also as director, in March 1988, months before any of the violations occurred. Asked whether there came "a time when you left Sunrise Produce of your own [v]olition," J.A. 85, Bell responded:

Yes. I cannot recall why and how it started but we got involved in some argument. Honestly I can't recall what it was all about. I said I don't want the aggravation any more and I said I'm quitting. . . .

It was not for a few days and Mr. Mailley was calling for me and he said "Jean-Pierre we can sit down and talk and just forget about whatever we were fussing about." I was making decent money there and over the years, those people were close to me. We had become friends and I also was feeling bad about it.

So I went back and that's when I told Mr. Mailley I said "look Billy, I don't want this Vice President title or whatever I have over my head." I say I'm not going to leave my job. I'm going to stay here and work and do the things I enjoy doing, talking to my customers, selling and go out in the street and meet people. I'm not going to quit that. I say as long as things are working fine over here. If you don't run into more problems, I said "I'm going to stay here." I'm gonna work but I just want to be an employee. I don't even want to get back this title.

Mr. Mailley agreed with me and there was no reason for me—We were so close to each other in many ways that it was no reason for me to write a piece of paper and get him to sign it.

J.A. 86–87. Mailley corroborated this testimony and explained that he failed to remove Bell's name from the forms "because I was having enough problems of my own" and "it didn't matter whether I changed anything or not to myself anyway because he really didn't have any say so in what was going on anyway." J.A. 104–05.

The record appears unclear as to whether Bell ever knew or understood that he was a "director" (for purposes of PACA). When asked if he was ever a director of Sunrise, he responded:

Well I never recalled being called the director of anything. I knew that my boss, Mr. Mailley, would refer that I was the Director of Sales. But that was just a

word. It was just a name. It was nothing official. No title was given to me. We never even discussed anything like that. J.A. 83. It is undisputed that Bell never attended directors' meetings, because none was ever held. As election "without proof of acceptance" is generally insufficient under corporate law to establish directorship, see 3 Beth Buday & Gail O'Gradney, *Fletcher Cyclopedia of the Law of Private Corporations* § 995 (Perm. ed. 1994), Bell's testimony, plus the absence of directors' meetings, suggest that he may never legally have become a director.

To the extent that Bell was aware at all of his directorship, he may have collapsed his two roles, as vice-president and as director, into one. Therefore, the reference to becoming "just . . . an employee" and to eliminating "this title" could refer to shedding not only his vice-presidency but also the directorship.

The Presiding Officer accepted the testimony that Bell briefly left the firm in 1988, but put a different spin on Bell's account of the conversation when he came back, turning what appears to be an oral resignation into a request for action by Mailley. He wrote, "[Bell] testified that when he returned to the firm, he asked Mailley to take the necessary action required to remove him from the position of vice-president. The record does not contain evidence to show that action was initiated." J.A. 17.

The Presiding Officer's analysis assumes that some written action by Mailley was necessary to make Bell's resignation effective. But as we noted in *Veg–Mix*, 832 F.2d at 613, a director's resignation ordinarily need not be in writing. The record does not indicate that Sunrise's articles of incorporation imposed any additional formalities on resignation. Compare *id.* In *Veg–Mix* we explicitly rejected claims that the failure of the sole shareholder to remove the director from the forms made the resignation ineffective and that the ex-director could revoke his resignation by later signing documents under the mistaken belief that he was still a director. *Id.*

To contradict Bell's testimony about his resignation, the Department presented two kinds of evidence. The first was Bell's signa-

ture on two "Waiver of Notice" forms for the annual meetings of Sunrise's board of directors, dated April 6 of 1988 and of 1989. Bell testified that in signing one of these forms (presumably in 1988), he assumed he was giving written confirmation of his resignation as vice-president. J.A. 87–88. The Presiding Officer found that because the documents were "clearly identified" and "signed in successive years", it was "hardly conceivable that Petitioner could have believed the documents contained his resignation as the vice-president of Sunrise." J.A. 17. But if Bell had previously effectively resigned, his signature on waivers of notice could make him a director again only if it represented knowing acceptance of re-election after that resignation. See *Veg–Mix*, 832 F.2d at 613. If the Presiding Officer regarded the signatures as manifesting such acceptance, he made no finding to that effect.

The second kind of evidence, discussed above, was the purported minutes of the 1988 and 1989 shareholders' and directors' meetings recording Bell's re-election as vice-president and director of Sunrise. If Bell's resignation was effective, however, the creation of such minutes by Mailley's lawyer would not legally re-elect Bell unless he knowingly accepted election.

Thus, unless the Presiding Officer discredited Bell's testimony of an oral resignation, or unless there is some reason that such a resignation was ineffective at the time, or unless Bell was legally re-instated as a director or officer, he was not a director or officer of Sunrise, nominal or real, during the relevant period.

*Nominal officer or director.* Like Quinn and Minotto, Bell seems to have been made an officer and a director of Sunrise for the administrative convenience of the company as it completed paperwork for PACA and for legally required corporate formalities. Moreover, like Quinn, Bell never participated in the formal decisionmaking structures of the corporation, such as board meetings; the meetings were never held, and the structures existed only on paper. J.A. 103–04. In that sense, Bell's case is more compelling than that of Minotto, who attended all board meetings and voted on resolutions.

Bell's awareness of some company wrongdoing may provide a distinction between this case and *Quinn* and *Minotto*. A friend in a company across the street told Bell of "outstanding debt", *id.* at 84, saying that "the tab was pretty big." *Id.* Since Bell understood the debt to be connected with Mailley's obligations to the persons he had bought out, J.A. at 84, 84–85, 94, 98, at least some of the information he received was irrelevant to Sunrise's PACA violations, and indeed may have long antedated the period of violations. Suppliers of Sunrise evidently would occasionally complain that "Billy [Mailley]'s check bounced", J.A. at 85, but the frequency is unclear. Moreover, to the question, "Did people come to you when they were not paid?" Bell answered unequivocally "No." J.A. 92. This clearly means suppliers did not regard Bell as having authority to bring about payment by Sunrise; it may also suggest that he was not even on notice of serious complaints. Further, Bell's most pertinent knowledge, relating to bouncing checks, evidently reached him not in his capacity as salesman but by the accident of his answering the office phone for Mailley's convenience. J.A. 84–85.

While the Presiding Officer did not really attempt to apply *Quinn* or *Minotto*, the Department argues here that under our cases ignorance of company wrongdoing is a *sine qua non* of a finding that an officer's or director's relation to the corporate licensee was nominal. Our cases do not lay down any such rule. True, we noted that Lilly Minotto "denied knowledge of the Company's transactions which gave rise to the underlying violations." 711 F.2d at 408. But our decision never said that was a prerequisite to status as a nominal director. Moreover, Minotto was the licensee's bookkeeper and accountant, always on hand in its office, and an undeviating attender of board meetings, and our decision never explored the possible conflict between her denial and any natural inferences from those facts. On remand, if the Department reaches the issue, it must formulate some principle delineating the role of differing degrees of knowledge of general corporate difficulties, or of "transactions which gave rise to the underlying violations",

or of the violations themselves, consistent with our cases.

*Alter Ego.* Contrary to the Department's contention, Bell adequately raised below the issue of whether the substance and form of Mailley's control over Sunrise was such as to "negate its separate personality", *Quinn,* 510 F.2d at 758, thus making it impossible to classify Bell as an officer or director. In his petition for review within the Department, Bell argued that "Sunrise Produce operated under the exclusive direction of Mailley and his attorney", that there "were no actual corporate formalities" observed by Sunrise, that Mailley operated the business himself, and that his lawyer "completed forms to make it appear that there were directors and officers and meetings when, in fact, there were none." J.A. 8. Moreover, much of the testimony at the hearing went to the question of Mailley's control of Sunrise and to the insubstantiality of the corporate forms. See, e.g., J.A. 87–88, 103–05.

Indeed, the proof showed a corporation no more substantial than that described in *Quinn.* Here, as there, "all decision making in this corporation was done by" the sole stockholder, who chose the directors and officers and made all corporate policy decisions. 510 F.2d at 757. While in *Quinn* policy decisions were made "where appropriate through [the] Board of Directors", *id.,* here the board never even went through a charade of a meeting. And although in *Quinn* we did not dispositively rule that the facts asserted showed enough dominance to require disregard of the corporate form, that was surely the implication of our remand for a hearing on Quinn's offer of proof.[2]

Accordingly, on remand the Department must consider in the light of *Quinn* whether Sunrise was the alter ego of Mailley and thus in effect a sole proprietorship during the period of the violations. If so, Bell could not be its officer or director, and thus could not

be responsibly connected with it within the meaning of the Act.

\* \* \*

Because the Presiding Officer disregarded the limits of § 499a(9) stated in *Quinn* and *Minotto,* and ignored our law about the effectiveness of oral resignation as set forth in *Veg–Mix,* we remand for further consideration in light of this opinion.

*So ordered.*

---

2. We note that the Department has used the concept of alter ego offensively, finding a person "responsibly connected" with a licensee even though he was not an officer, director, or a major shareholder, entirely on the theory that it was his alter ego. *In re Midland Banana & Tomato Co., Inc.,* PACA Docket Nos. D–93–548,

D–93–549, —— Agric. Dec. —— (U.S.D.A.1994); see also *In re Perfect Potato Packers, Inc.,* 45 Agric. Dec. 338 (U.S.D.A.1986) (applying alter ego doctrine under § 499h(c) to revoke a PACA license on the grounds that it was fraudulently obtained by the alter ego of a man barred from employment in the industry).