[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 15, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-11609
Non-Argument Calendar

_____

Agency No. 04-0003-PACA-APP

JAMES E. THAMES, JR.,

Petitioner,

versus

U.S. DEPARTMENT OF AGRICULTURE,

Respondent.

_____

Petition for Review of a Decision of the
Department of Agriculture

_____

**(August 15, 2006)**

Before BIRCH, BLACK and BARKETT, Circuit Judges.

PER CURIAM:

James E. Thames, Jr., petitions for review of the final decision of the Secretary of Agriculture, acting through a Department of Agriculture Judicial Officer ("JO"), determining that Thames was "responsibly connected" with John Manning Company, Inc., ("John Manning") at a time during which that company violated section 2(4) of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499b(4), thereby subjecting him to licensing and employment restrictions under the PACA. See 7 U.S.C. § 499h. Because we find that there is substantial evidence in the record to support the JO's determination, the petition is DENIED.

## I. BACKGROUND

Thames began working in the produce packing industry in 1963. He joined John Manning, a tomato re-packing plant, in 1991, at which point he, George Fuller, Jr., and Jon Fuller each owned 31 percent of the stock and George Fuller, Sr., one of the founders, owned 7 percent. ROA-Tab 11, ¶ 1. Thames and the Fullers also constituted the board of directors of John Manning at that time. Thames held the position of vice president, ran the tomato-repacking line, purchased produce, and was responsible for hiring and firing those working on the line.

In 1999, the board decided to bring Steve McCue into the company. George Fuller, Sr., sold his 7 percent to McCue, and Thames and the other Fullers sold

2

enough of their stock to make McCue, Thames and the younger Fullers equal one-fourth owners.  Id. Tab 11, ¶ 2.  McCue was also made president of John Manning.

After a year, with the business going well, McCue told the other board members that he would stay with John Manning only if he were made a majority stockholder in the business.  On 27 August 2001, Thames and the younger Fullers sold McCue sufficient stock, at one dollar per share, to make him an owner of 51 percent while they shared ownership of the remaining 49 percent.  Id. Tab A at 17-18.  Thames continued to serve as vice president and owned 16.2 percent of the corporate shares of John Manning.  Id. Tab 7.

John Manning's by-laws provide that "[t]he holders of a majority of the stock issued and outstanding . . . shall constitute a quorum at all meetings of the shareholders for the transaction of business" and that "the affirmative vote of the majority of the shares represented at the meeting and entitled to vote on the subject matter shall be the act of the shareholders."  Id. Tab 4, §§ 2.5, 2.7.  The by-laws also provide that "the property and business of the corporation shall be managed by its Board of Directors," which, as elected by the shareholders, is to "consist of not less than three nor more than five members."  Id. Tab 4, §§ 3.1, 3.2; see id. Tab 4, § 2.2.  Finally, "[a] majority of the members of the Board shall be necessary to constitute a quorum and a matter may be carried by a majority within the quorum.

The act of a majority of the directors at any meeting at which there is a quorum shall be the act of the Board of Directors." Id. Tab 4, § 4.5.

As for corporate officers, the by-laws provide that the president "shall have general and active management of the corporation, and shall see that all orders and resolutions of the Board are carried into effect." Id. Tab 4, § 5.4(a). If the President fails to act in accordance with this duty, the Vice President "shall have all the powers of the President, and shall perform such duties as shall from time to time be imposed upon him by the Board of Directors." Id. § 5.5. Finally, "[a]ll checks and drafts shall be signed in such a manner as the Board of Directors may from time to time determine." Id. Tab 4, § 12.1.

Thames testified that, after McCue became majority shareholder, Thames continued to run the tomato processing line and to manage his employees, as he had previously done, but that he was no longer involved in purchasing produce. He explained that he was not included in any meetings with the accountant McCue hired nor did he have any check-signing authority. Id. Tab A at 20-22. Thames was paid $1000 a week for his work. Id. Tab A at 27. He was also entitled to receive a portion of any retained earnings in proportion to the stock he held. Thames worked in this capacity until John Manning closed its doors. Throughout this period, he also continued to sit on the board of directors along with McCue

4

and the younger Fullers. In that capacity, Thames signed two guarantees for loans on behalf of John Manning, one for $100,000 in September 1999 and one for $250,000 in December 2000. Id. Tab A at 59. He also signed a lease for new expanded headquarters. Throughout this period, Thames attended board meetings at which John Manning's financial concerns were discussed.

At the meeting on 24 April 2002, the board discussed the corporation's precarious financial situation, which had been made evident by its failure to pay monthly group health insurance premiums, the discontinuation of corporate cell phone service, its failure to pay the Blue Book bill, and trouble paying produce suppliers. At that meeting, McCue sought and was granted permission by the younger Fullers to ask their father for a loan to stave off the bankruptcy of John Manning.

At a follow-up meeting held five days later, the board discussed obtaining a loan for $200,000 to be secured by a guarantee signed by the directors. Id. Tab 15, ¶ 6. The younger Fullers refused to sign the guarantee without first being provided certain financial information. On 3 May 2002, the board met for a third time and McCue distributed a 2001 year-end report showing a loss of $140,805 for 2001 and a $32,598 loss for the first quarter fo 2002. Id. Tab 16, ¶ 3. The board members refused to assist with an infusion of personal cash and John Manning closed its

doors that August. Its PACA license was terminated on 5 June 2003, for failure to pay the annual renewal fee.

In November 2003, the Chief of the PACA Branch, Fruit and Vegetable Programs, Agricultural Marketing Service, United States Department of Agriculture, determined that Thames was responsibly connected with John Manning at the time it violated the PACA by failing to make full and prompt payment for certain lots of perishable agricultural commodities. Thames filed a petition seeking reversal of this determination. In April 2004, an Administrative Law Judge ("ALJ") consolidated his case with those of the two younger Fullers and conducted a hearing in Atlanta in March 2005. In October, the ALJ issued a decision and order finding that all three were responsibly connected to John Manning at the time of the violations. Thames then sought review of that decision. The JO, acting for the Secretary of Agriculture, adopted the ALJ's conclusions and found that Thames had failed to prove by a preponderance of the evidence that he was only nominally an officer, director, or shareholder of John Manning. Thus, the final decision of the Secretary was that Thames was responsibly connected to John Manning for purposes of the PACA licensing and employment restrictions. Thames has filed a timely petition for our review, virtually repeating the arguments he made before the JO.

## II. DISCUSSION

With an aim to prevent unfair business practices and promote financial responsibility in the interstate commerce of the shipping and handling of perishable agricultural commodities, the PACA requires that brokers and dealers be licensed by the Secretary of Agriculture and that licensees refrain from unfair business conduct. 7 U.S.C. §§ 499b(4), 499c-499d; see Bama Tomato Co. v. USDA, 112 F.3d 1542, 1545 (11th Cir. 1997). To promote compliance, the PACA authorizes the Secretary to revoke or suspend the license of a licensee who fails to "make full payment promptly" for perishable shipments and to restrict employment within the industry of "any person who is or has been responsibly connected with" such a violator. 7 U.S.C. §§ 499b(4), 499h(b).

"We uphold a USDA decision under the PACA unless we find the decision to be unconstitutional, arbitrary, capricious, an abuse of discretion, or in excess of statutory authority." Bama Tomato Co., 112 F.3d at 1546 (citing 5 U.S.C. § 706(2)). We review factual findings, such as the determination that a person is "responsibly connected" with a violating licensee, under the substantial evidence test. Id. Under this test, an agency determination must be supported by the record in the form of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S.

7

197, 229, 59 S. Ct. 206, 217 (1938). Under "this deferential standard of review[,] . . . as long as the conclusion is reasonable, we defer to the agency's findings of fact even if we could have justifiably found differently." Kelliher v. Veneman, 313 F.3d 1270, 1277 (11th Cir. 2002).

Under the PACA, a person is "responsibly connected" if he or she is "affiliated or connected with a commission merchant, dealer, or broker as . . . [an] officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association." 7 U.S.C. § 499a(b)(9). The presumption that a person so situated is responsibly connected may be rebutted, however, if

> the person demonstrates by a preponderance of the evidence that the person was not actively involved in the activities resulting in a violation of [the PACA] *and* that the person either was only nominally a partner, officer, director, or shareholder of a violating licensee or entity subject to license or was not an owner of a violating licensee or entity subject to license which was the alter ego of its owners.

Id. (emphasis added).[1]

With regard to the second part of this test, Thames argues that, because the by-laws of John Manning gave McCue, as president, director, and majority shareholder, the unqualified authority to elect and remove directors or corporate officers, he occupied his positions as vice-president and director only at McCue's

_____

[1]In this case, because he owned 16.2 percent of the outstanding John Manning stock at the time of the violations, the latter option, regarding ownership of a violating licensee, is not available to Thames.

whim, and was thus only a nominal officer and director. Courts interpreting this statute, however, have held that to be considered a nominal officer or director, a person must show that he lacks any "actual, significant nexus with the violating company," and "therefore, neither knew nor should have known of the company's misdeeds." Hart v. Department of Agriculture, 112 F.3d 1228, 1231 (D.C. Cir. 1997) (quotations and punctuation omitted).

Here, in light of his lengthy experience working in the produce repacking industry in general, and his more than decade-long experience as an officer and director at John Manning, Thames had sufficient background to understand the import of the corporation's financial predicament. As a continuing director, under sections 3.1 and 4.5 of the by-laws, Thames had a vote equal to McCue's as to any matter involving the management of John Manning's property and business. Thames attended board meetings during the period of the violations at which he could have voted as part of a majority, along with the Fullers, to address John Manning's financial problems.

Although Thames asserts that courts have found that attendance at board meetings, the ability to vote at a meeting, and knowledge of the fact that producers were going unpaid do not necessarily preclude nominal director or officer status, each of the cases he cites is easily distinguishable from the facts of his case. First,

in <u>Minotto</u>, the director at issue was a clerical employee, with no prior experience in the produce industry and no knowledge of the activities that led to the violating transactions, who had been put in the position to ensure a quorum at board meetings. <u>Minotto v. USDA</u>, 711 F.2d 406, 407-09 (D.C. Cir. 1983). In <u>Bell</u>, the person in question was made president of the corporation to mediate disputes between the two owners, but "never participated in the formal decisionmaking structures of the corporation." <u>Bell v. Dep't of Agric.</u>, 39 F.3d 1199, 1204 (D.C. Cir. 1994). Yet another corporation appointed a production line supervisor as vice-president to satisfy a statutory minimum number of officers, but gave him no decisionmaking authority in that role. <u>Quinn v. Butz</u>, 510 F.2d 743, 747 (D.C. Cir. 1975). Finally, a further wholesale produce business made the manager of its vegetable department titular president, apparently without his understanding that it had done so, upon his investing $40,000 in the company, but he never attended any corporate meetings. <u>Maldonado v. Dep't of Agric.</u>, 154 F.3d 1086, 1087 (9th Cir. 1998).

Thames, on the other hand, had plenty of background in the produce industry and had long sat on the board of John Manning out of his own entrepreneurial interests rather than for the administrative convenience of the corporation. Further, in addition to attending board meetings, Thames continued to

10

run the processing line, to be paid his salary of $1000 per week, and to have the right to receive a portion of retained earnings. Finally, although McCue could have removed Thames from the board of directors, he never did so. Accordingly, we conclude that there is sufficient evidence in the record to support the conclusion of the JO, on behalf of the Secretary of Agriculture, that, at the time of the PACA violations, Thames "had an actual, significant nexus with" John Manning and possessed oversight and governance powers that "he failed to use in an effort to prevent [John Manning's] violations of the prompt payment provision of the PACA," and thereby failed to establish that he was only nominally an officer or director of John Manning for purposes of the PACA's licensing and employment restrictions.[2] Administrative Papers, Decision and Order of the Judicial Officer for the Secretary of Agriculture at 20-21, 26 (Jan. 24, 2006.).

### III. CONCLUSION

Thames petitions for review of the final determination of the Secretary of Agriculture that he was responsibly connected with John Manning when it violated the PACA. We find that there is substantial evidence in the record to support the JO's determination that Thames failed to demonstrate he was only a nominal

---

[2]Because the record supports the conclusion that Thames was not a nominal officer or director, we do not reach the issue of whether he was "actively involved" in the activities resulting in violations of the PACA.

director and officer of John Manning at the time of the violations and was thus responsibly connected to the company for purposes of licensing and employment restrictions. Accordingly, the petition is **DENIED**.