IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-8170
_____


FIRST GIBRALTAR BANK, FSB and
BENEFICIAL TEXAS, INC.,

                    Plaintiffs-Appellants,

v.

DAN MORALES, Atty. General, as
Attorney General for the State of
Texas, ET AL.,

                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas
_____
(January 4, 1994)

Before POLITZ, Chief Judge, KING and DAVIS, Circuit Judges.

PER CURIAM:

     Our prior opinion in this case, First Gibraltar Bank, FSB v.
Morales, 19 F.3d 1032 (5th Cir.), cert. denied, 115 S. Ct. 204
(1994), is vacated and the following is substituted therefor.

     The issue presented for our determination is whether the Home
Owners' Loan Act,[1] 12 U.S.C. §§ 1461-1468c, and Chapter 39 of Title
12 of the United States Code, formerly designated as the
Alternative Mortgage Transaction Parity Act of 1982, together with
regulations thereunder, have preempted the Texas homestead law to

_____

     [1] Terms defined in our prior opinion will have the same
meaning herein as therein defined.

the extent that it prohibits lenders from enforcing liens on home equity created in reverse annuity mortgages or line of credit conversion mortgages. The district court granted summary judgment in favor of the defendants, concluding that the federal statutes and regulations did not preempt Texas homestead law. We affirm the judgment of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit began as an action for declaratory and injunctive relief. First Gibraltar sought a judicial declaration that the HOLA and the Parity Act (together with the regulations promulgated thereunder) preempted portions of the Texas homestead law. In addition, First Gibraltar sought an injunction to prevent the Texas Attorney General and the Texas Consumer Credit Commissioner from enforcing the allegedly preempted portions of the Texas homestead law. In First Gibraltar Bank, FSB v. Morales, 19 F.3d 1032 (5th Cir.), cert. denied, 115 S. Ct. 204 (1994), we reversed the district court's grant of summary judgment for the State defendants, holding, inter alia, that the OTS and its predecessor, the FHLBB, had the statutory authority to effectuate such a preemption.

Before the issuance of our mandate, however, the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 was signed into law on September 29, 1994.[2] See Pub. L. No. 103-328, 108

_____

[2] At this time, the State's petition for certiorari to the Supreme Court was pending.

Stat. 2338 (1994).  Section 102(b) of this Act amends section 3 of the HOLA, 12 U.S.C. 1462a, by adding a new subsection (f) (the "Amendment"):

> (f)  STATE HOMESTEAD PROVISIONS. -- No provision of this Act or any other provision of law administered by the Director [of the Office of Thrift Supervision] shall be construed as superseding any homestead provision of any State constitution, including any implementing State statute, in effect on the date of enactment of the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, or any subsequent amendment to such a State constitutional or statutory provision in effect on such date, that exempts the homestead of any person from foreclosure, or forced sale, for the payment of all debts, other than a purchase money obligation relating to the homestead, taxes due on the homestead, or an obligation arising from work and material used in constructing improvements on the homestead.

Pub. L. No. 103-328, § 102(b), 108 Stat. 2338, 2352 (1994).  Our mandate has not yet issued in this appeal, and "[t]he normal rule in a civil case is that we judge it in accordance with the law as it exists at the time of our decision." Tully v. Mobil Oil Corp., 455 U.S. 245, 247 (1982).  Thus, we must examine the effect of the Amendment in our consideration of this matter on appeal. See id. at 247-49 (applying statutory changes that occurred during the pendency of the appeal); United States Dep't of Justice v. Provenzano, 469 U.S. 14, 15 (1984) (per curiam) (noting that the issue on which certiorari was granted is "to be judged under the law presently in effect").

## II.  STANDARD OF REVIEW

A district court's conclusions of law are reviewable de novo. Prudhomme v. Tenneco Oil Co., 955 F.2d 390, 392 (5th Cir.), cert. denied, 113 S. Ct. 84 (1992).  Nevertheless, we are required to

3

give deference to an executive agency's interpretation of a statute or regulation that the agency is responsible for administering. Of course, if the intent of Congress is clear, that intent will trump any agency interpretation to the contrary. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842 (1984); Hawkins v. Agricultural Mktg. Serv., Dep't of Agric., 10 F.3d 1125, 1129 (5th Cir. 1993).

### III. ANALYSIS AND DISCUSSION

We begin by examining our authority to continue adjudicating this case, and we then briefly discuss the relationship between the Amendment and our prior analysis.

### A. Control Over our Mandate

"Our control over a judgment of our court continues until our mandate has issued." Alphin v. Henson, 552 F.2d 1033, 1035 (4th Cir.), cert. denied, 434 U.S. 823 (1977); see Gradsky v. United States, 376 F.2d 993, 995 (5th Cir. 1967). Similarly, as the Ninth Circuit has noted, "where the mandate has not issued the availability of appeal has not yet been exhausted." Bryant v. Ford Motor Co., 886 F.2d 1526, 1530 (9th Cir. 1989), cert. denied, 493 U.S. 1076 (1990). In exceptional circumstances, we may even recall our mandate to prevent injustice. See Gradsky, 376 F.2d at 995; Rules of the United States Court of Appeals for the Fifth Circuit, Rule 41.2.

First Gibraltar has argued that pursuant to Federal Rule of Appellate Procedure 41(b), our mandate should have issued as soon as the Supreme Court denied certiorari. The Supreme Court denied

4

certiorari in this case on October 3, 1994, and its order was received and filed on October 13, 1994. Prior to the denial of certiorari, however, we had stayed the mandate in this case for two independent reasons; first, to permit an en banc poll (which is now unnecessary), and second, to allow the State to petition for certiorari. The mandate was initially stayed well before the October 13, 1994 receipt of the Supreme Court's order denying certiorari. Rule 41(b) does state in relevant part that "[t]he court of appeals must issue the mandate immediately when a copy of a Supreme Court order denying the petition for writ of certiorari is filed," but because our stay was in effect (for a reason independent of the petition for certiorari) prior to the receipt of the order, we retain discretionary control over our mandate.[3] See Bryant, 886 F.2d at 1528-31; Alphin, 552 F.2d at 1034-36.

Because the mandate is still within our control, we have the power to alter or to modify our judgment. See Bryant, 886 F.2d at 1528-31 (vacating a prior en banc opinion in light of new legislation, even though the Supreme Court had previously denied certiorari, because the issuance of the mandate had been stayed for an independent reason before the order denying certiorari was filed in the circuit court); Alphin, 552 F.2d at 1034-36 (modifying a

---

[3]     To the extent that appellants attach any meaning to the Supreme Court's denial of certiorari, the language of the Alphin court is instructive: "The law is clear that the denial of certiorari decides nothing except that the writ will not be granted for reasons which are undisclosed." Alphin, 552 F.2d at 1035 n.6.

5

prior judgment to conform to new legislation, even though the Supreme Court had previously denied certiorari, because the issuance of the mandate had been stayed for an independent reason before the denial of certiorari was filed in the circuit court). As mentioned, we are to apply the law as it currently exists, and we must necessarily include the effects of the Amendment in our consideration.

## B. Mootness

Despite the State's contention that the Amendment moots this appeal, we find that the mootness framework is inapplicable to the posture of this lawsuit. The Amendment clearly affects the preemption analysis in this case. The Amendment does not, however, eliminate the "actual controversy" between the parties; it informs the decision, but it does not alter the original declaratory posture of the case. In other words, the parties still seek *the same* declaration of their rights, but such a declaration is now affected by the language of the Amendment. An "actual controversy," capable of being resolved by a declaratory judgment, is still ongoing. See generally 10A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2751 (1984). Thus, the mootness rubric is inapposite, and the Munsingwear line of cases -- a line that addresses the proper disposition of a lawsuit after a mootness determination -- is inapplicable as well. Accordingly, we proceed to resolve this appeal on the merits.

## C. Context of the Amendment

Before we begin to analyze the effects of the Amendment, it is helpful to understand the relationship of the Amendment to our prior analysis. In our previous opinion, we noted that the Supreme Court's preemption analysis required us to ask two questions: first, did the OTS intend to preempt Texas homestead law; and second, if the OTS did intend to preempt Texas homestead law, was the attempted preemption within the scope of the agency's delegated authority? See First Gibraltar Bank, 19 F.3d at 1044, 1049; see also Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 158-59 (1982). With respect to the second prong, we noted in our prior opinion that "the best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency." First Gibraltar Bank, 19 F.3d at 1049 (quoting Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986)).

In this case, the Amendment clearly affects the second prong of the preemption analysis, as the statutory language addresses the scope of the congressional grant of authority to the OTS. As a consequence, this second prong of the preemption analysis is now the focus of our attention. And, answering it as we do, we need not, and do not, address the first prong of the preemption analysis.

### D. Infringement on the Judicial Branch

First Gibraltar initially argued that the HOLA expressed no limits on the FHLBB/OTS's authority to regulate the lending

7

practices of federal savings and loans, as the HOLA granted plenary authority to the agency to issue regulations preempting portions of the Texas homestead law. Following enactment of the Amendment, First Gibraltar contends that the language of the Amendment unconstitutionally undermines the power of the judicial branch by mandating a different construction of the HOLA, rather than by changing the underlying law. First Gibraltar relies on the Supreme Court cases of <u>United States v. Klein</u>, 80 U.S. (13 Wall.) 128 (1871), and <u>Pennsylvania v. The Wheeling and Belmont Bridge Co.</u>, 59 U.S. (18 How.) 421 (1855), for the proposition that Congress cannot "prescribe a rule for the decision of a cause in a particular way"; instead, Congress can only change the underlying law. Because the Amendment states that no provision of law "**shall be construed** as superseding any homestead provision," First Gibraltar argues that the Amendment "usurps the power of the courts by directing a specific interpretation of unchanged statutory and regulatory provisions." Assuming, without deciding, that First Gibraltar is correct in its initial argument that the FHLBB/OTS had plenary authority under the HOLA to preempt portions of the Texas homestead law, we disagree with First Gibraltar's characterization of the Amendment's language, as we find that the Amendment would clearly change such plenary authority.[4]

---

[4] It is important to note that we do not comment on whether First Gibraltar's interpretation of <u>Klein</u> and <u>Wheeling Bridge</u> is accurate. Instead, we merely determine that **as interpreted by First Gibraltar**, these cases do not warrant a finding that the Amendment is unconstitutional because the Amendment does change the existing law (as that law is construed by First Gibraltar). <u>Cf.</u> <u>Robertson v. Seattle Audubon Soc'y</u>, 112

8

In analyzing the effect of this language, the Supreme Court's decision in <u>Louisiana Pub. Serv. Comm'n</u> is quite instructive.  In that case, the Supreme Court addressed whether the Communications Act of 1934 granted the Federal Communications Commission ("FCC") the authority to preempt inconsistent state regulations, specifically those that deviated from the FCC's depreciation practices.  <u>See</u> <u>Louisiana Pub. Serv. Comm'n</u>, 476 U.S. at 358.  The Court noted that § 151 of the Communications Act gave the FCC broad discretion "to develop a rapid and efficient national telephone network."  <u>Id.</u> at 368.  Because of this broad mandate, the Court observed that § 151 provided support to the position that the Act preempts state regulation "which frustrates the ability of the FCC to perform its statutory function of ensuring efficient, nationwide phone service."  <u>Id.</u> at 370.

Section 152(b) of the Act, however, asserted the following:

> [N]othing in this chapter **shall be construed** to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service . . . .

<u>Louisiana Pub. Serv. Comm'n</u>, 476 U.S. at 370 (quoting 47 U.S.C. § 152(b)) (emphasis added).  The Court referred to this language as an "express jurisdictional limitation[] on FCC power," and the Court specifically noted that "Section 152(b) constitutes . . . *a congressional denial of power to the FCC* to require state

---

S. Ct. 1407, 1414 (1992) ("The Court of Appeals held that [the legislation] was unconstitutional under <u>Klein</u> because it directed decisions in pending cases without amending any law.  Because we conclude that [the legislation] *did* amend applicable law, we need not consider whether this reading of <u>Klein</u> is correct.").

commissions to follow FCC depreciation practices for intrastate ratemaking purposes." Id. at 370, 374 (emphasis added). Thus, the Court held that § 152(b) "denies the FCC the power to pre-empt state regulation of depreciation for intrastate ratemaking purposes." Id. at 373. We conclude, therefore, that the Supreme Court interpreted the "shall be construed" language of § 152(b) as a legitimate limitation on the scope of authority delegated by Congress to the FCC.

If, as First Gibraltar argued, in enacting the HOLA, Congress expressed no limits on the FHLBB/OTS's authority to regulate the lending practices of federal savings and loans, the law has been changed because the relevant language of the later Amendment provides such a limitation. The Amendment states that "[n]o provision of this Act or any other provision of law administered by the Director [of the Office of Thrift Supervision] **shall be construed** as superseding any homestead provision of any State constitution." Just as this language was seen as a congressional denial of power to the FCC in Louisiana Pub. Serv. Comm'n, we interpret the Amendment's language as a congressional narrowing of authority to the OTS. Because the "shall be construed" language represents a congressional denial of power where once, arguendo, there were "no limits," the Amendment represents a change in the underlying law and avoids any of First Gibraltar's alleged separation of powers problems between the legislature and the judiciary.

10

Our conclusion is strengthened by the legislative history of the Amendment. The Joint Explanatory Statement of the Committee of Conference accompanying the Amendment explicitly notes that:

> ***[t]his amendment clarifies that neither the Home Owners' Loan Act nor any other provision of law provides the Director of the Office of Thrift Supervision with the authority***, through regulation or otherwise, ***to preempt Texas law in the area of homestead protection***. By extension, housing creditors under the Alternative Mortgage Transaction Parity Act who were impacted by the decision in the <u>First Gibraltar</u> case also continue to be subject to Texas law in the area of homestead protection.

H.R. Conf. Rep. No. 651, 103rd Cong., 2d Sess. 57-58 (1994) (emphasis added). Thus, it is clear that the Amendment was designed to restrict the congressional delegation of authority to the OTS with regard to preemption of state homestead laws. This explicit legislative purpose is consistent with our analysis and with our conclusions about the statutory language itself.

Finally, numerous statutory schemes use the language "shall be construed" to describe the limitations and boundaries of a congressional delegation of authority.[5] <u>See, e.g.</u>, McCarran-Ferguson Insurance Regulation Act, 15 U.S.C. § 1012(b) ("No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . ."); ERISA, 29 U.S.C. § 1144(b)(2)(A) ("Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities."); Omnibus

---

[5] Indeed, the appendix to the State's brief indicates that 2,020 statutory sections of the United States Code contain the language "shall be construed."

11

Budget Reconciliation Act, 42 U.S.C. § 1395ss(j) ("Nothing in this section shall be construed so as to affect the right of any State to regulate medicare supplemental policies which, under the provisions of this section, are considered to be issued in another State."). These statutes are not constitutionally infirm because of their use of "shall be construed," and we see no reason to reach a different result with regard to the Amendment in this case.[6]

### E.   Infringement on the Executive Branch

First Gibraltar also argues that the Amendment infringes on the authority of the executive branch "because it overturns agency action that has developed over at least fifteen years without

---

[6]     First Gibraltar attempts to distinguish these statutes from the Amendment by noting that "[s]uch provisions . . . are not, as in this case, enacted many years after the original legislation with the express purpose of overturning the result of a specific judicial decision." We conclude, however, that this is not a meaningful distinction. Congress retains the power to narrow the scope of its delegated authority at any time. See INS v. Chadha, 462 U.S. 919, 955 (1983) ("Congress must abide by its delegation of authority *until that delegation is legislatively altered or revoked*.") (emphasis added); Stop H-3 Ass'n v. Dole, 870 F.2d 1419, 1437 (9th Cir. 1989) ("It is fully within Congress' prerogative legislatively to alter the reach of the laws it passes . . . .").

Even though the Amendment's legislative history states that it "overturns an interpretation of [the HOLA] in First Gibraltar Bank v. Morales," such an express purpose is not troublesome because Congress constitutionally restricted the scope of authority delegated to the OTS. Moreover, the simple enactment of legislation to overturn a particular judicial decision is not problematic in itself. See, e.g., Louisiana Pub. Serv. Comm'n, 476 U.S. at 372 ("It is certainly true . . . that when Congress was drafting the Communications Act, § 152(b) was proposed and supported by the state commissions in reaction to what they perceived to be the evil of excessive federal regulation of intrastate service such as was sanctioned by the Shreveport Rate Case . . . . [W]e agree that provisions in both the Senate and House bills were designed to overrule the Shreveport Rate Case . . . .").

suggesting that the agency overreached its authority or otherwise acted improperly."  Similar to its infringement on the judiciary argument, First Gibraltar contends that "Congress cannot merely exercise a veto power over a legitimate exercise of executive authority without changing the agency's instructions, and without mandating any change in the agency's future conduct or regulatory scheme."

Once again, however, we disagree with First Gibraltar's characterization, as Congress has narrowed the agency's authority. As part of its legislative powers, Congress designates the scope of agency authority, and if Congress so chooses, it can subsequently restrict or limit that delegation of power to the agency.  The Supreme Court has noted that "Congress ultimately controls administrative agencies in the legislation that creates them," and more importantly, the Court has observed that "Congress must abide by its delegation of authority **until that delegation is legislatively altered or revoked**."  See <u>Chadha</u>, 462 U.S. 919, 955 & n.19 (1983) (emphasis added); <u>see also</u> <u>Stop H-3 Ass'n v. Dole</u>, 870 F.2d 1419, 1437 (9th Cir. 1989) ("It is fully within Congress' prerogative legislatively to alter the reach of the laws it passes . . . ."); <u>Office of Consumers' Counsel v. Federal Energy Regulatory Comm'n</u>, 655 F.2d 1132, 1149, 1153 (D.C. Cir. 1980) (suggesting that Congress could have altered the Federal Energy Regulatory Commission's authority by passing new legislation). There is simply no infringement on the power of the executive branch when Congress narrows the scope of its delegated authority.

Assuming <u>arguendo</u> that the OTS's authority was previously plenary, the Amendment restricting the authority of the OTS represents a classic example of a legitimate exercise of legislative power. <u>Cf. Louisiana Pub. Serv. Comm'n</u>, 476 U.S. at 374 ("[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority. . . . [A]n agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless . . . Congress confers power upon it.").

Furthermore, and perhaps most importantly, this circuit has accorded deference to an agency's determination of its own statutory authority.[7] <u>See</u> <u>NCNB Tex. Nat'l Bank v. Cowden</u>, 895 F.2d 1488, 1494 (5th Cir. 1990) ("As the cases dealing with the pre-emptive effect of agency actions suggest, substantial deference to an agency's determination of its authority may be appropriate."); <u>Western Coal Traffic League v. United States</u>, 719 F.2d 772, 777 (5th Cir. 1983) ("We begin, as we must, with a recognition of the limited role this Court plays in reviewing an administrative agency's construction of its statutory authority . . . ."), <u>cert. denied</u>, 466 U.S. 953 (1984). With regard to the effect of the Amendment, in an amicus brief filed at our request, the OTS made the following observations:

---

[7] We follow our own case law, recognizing that, at least in one context, there is some debate on this subject. <u>Compare</u> <u>Mississippi Power & Light Co. v. Mississippi</u>, 487 U.S. 354, 377 (1988) (Scalia, J., concurring) <u>with id.</u> at 383 (Brennan, J., dissenting).

14

OTS understands the Gonzalez Amendment to preclude the agency, as of the date of enactment of the provision, from construing any provision of law administered by the Director as superseding the homestead provisions of Texas law that are at issue in this case. . . . OTS reads the amendment to change the applicable law and now to subject federal savings associations and certain other financial services institutions to the conditions of the Texas homestead laws.

According deference to the OTS's interpretation of its statutory authority, as we must, it is clear that even the agency in question construes the Amendment as a limitation on its authority. Finding no constitutional infirmity to dissuade us from this construction, we disagree with First Gibraltar's assertions, and we find that the Amendment is constitutionally valid. Cf. Louisiana Pub. Serv. Comm'n, 476 U.S. at 374 ("An agency may not confer power upon itself. To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. This we are both unwilling and unable to do.").

### F.  Effectiveness of the Amendment

First Gibraltar also contends that the Amendment is ineffective because the OTS regulations had already preempted the state homestead provisions before the Amendment was passed. Thus, First Gibraltar argues that "the conflicting provisions of the Texas homestead laws were not in effect on the date that Congress enacted the . . . Amendment, and the Amendment cannot, and does not attempt to resurrect previously preempted state law."

Assuming arguendo that portions of the Texas homestead law were preempted prior to the enactment of the Amendment, we cannot

15

agree with First Gibraltar's apparent assumption that once a law is preempted, it forever remains preempted and ineffective. First of all, we note that First Gibraltar fails to cite any authority in support of this proposition. Second, and more importantly, state law can be preempted by federal legislation and by regulations promulgated by federal agencies acting within the scope of their congressionally delegated authority. See Louisiana Pub. Serv. Comm'n, 476 U.S. at 369; de la Cuesta, 458 U.S. at 154. On the date of the Amendment's enactment, the OTS's preemption of state homestead law was no longer within the scope of its authority -- assuming that it ever was -- and consequently, there was no longer any preemptive mechanism. Because the Texas homestead laws had not been repealed, they **were in effect** on the date of the Amendment, although they were arguably impotent in the context of federal bank regulation. Once the preemptive mechanism was removed, however, the state homestead provisions -- already effective in all other areas -- were also effective in the area of federal bank regulation.

Similarly, we took great pains to make clear in our earlier decision that this lawsuit deals only with two types of alternative mortgage instruments -- the reverse annuity mortgage ("RAM") and the line of credit conversion mortgage. See First Gibraltar Bank, 19 F.3d at 1037. We specifically emphasized "that the question before us is not whether federal law has preempted Texas homestead law in its entirety, but only whether Texas homestead law has been preempted with respect to RAMs and line of credit conversion

16

mortgages." Id. at 1039.  Thus, any preemptive force of the OTS regulations would not have completely "invalidated" the Texas homestead laws.  Instead, the Texas homestead exemptions remained very much "in effect" as to many lenders, excepting, at most, the two types of alternative mortgage transactions at issue in this case.  Simply put, First Gibraltar's logic is puzzling, and without any supporting citations, we decline to accept its position.

## IV.   CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.  The mandate shall issue forthwith.

17