UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
 

No. 94-1479

ROBERT AND JENNIFER GRUNBECK,

Plaintiffs, Appellants,

v.

THE DIME SAVINGS BANK OF NEW YORK, FSB,

Defendant, Appellee.

 

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge] 

 

Torruella, Chief Judge, 

Campbell, Senior Circuit Judge, 

and Cyr, Circuit Judge. 

 

Jewel N. Klein, with whom Holstein, Mack & Klein, George P. 
Dickson and Law Offices of George Dickson were on brief for 
appellants.
Douglas G. Verge, with whom Richard P. Hazelton and Sheehan, 
Phinney, Bass & Green were on brief for appellee. 

 

January 23, 1996
 

CYR, Circuit Judge. The interesting issue of first CYR, Circuit Judge 

impression presented in this case is whether section 501(a)(1) of

the Depository Institutions Deregulation and Monetary Control Act

of 1980, 12 U.S.C. 1735f-7a(a)(1) (1988) ("Monetary Control

Act"), preempts New Hampshire Rev. Stat. Ann. 397-A:14(I) (West

Supp. 1994) ("Simple Interest Statute" or "SIS"). In a thought-

ful and comprehensive opinion, the district court ruled that the

Simple Interest Statute, as applied to a residential mortgage

loan permitting negative amortization, is preempted by section

501(a)(1). 

I I

BACKGROUND BACKGROUND 

On January 15, 1988, Dime Real Estate Services - New

Hampshire, Inc. ("Dime Real Estate NH") made a thirty-year

adjustable rate loan to Timothy Ray and Thomas F. Richards in the

approximate amount of $111,000, secured by a first mortgage on

their residence in Milford, New Hampshire. Dime Real Estate NH,

incorporated in New York and licensed to extend loans in New

Hampshire, is a wholly-owned subsidiary of Dime Savings Bank of

New York, FSB ("Dime Savings"), a federally-chartered savings

institution also incorporated in New York. The Ray and Richards

note, which contained a provision permitting negative amortiza-

tion, was assigned to Dime Savings the day it was made.

The interest rate was fixed at 7.75% for the first six

months, adjustable monthly thereafter at a margin of 3% above the

"monthly median cost of funds" ratio, as determined by the

2

Federal Home Loan Bank Board ("FHLBB"), and rounded to the

nearest one-eighth of one percentage point. The interest rate

was capped, by agreement, at 9.75% for the second six months, and

13.875% thereafter. The note afforded protection from unantici-

pated variable interest rate increases by permitting the borrower

to pay either the total principal and interest due for the month, 

or a lower "minimum required payment amount." In the event the 

borrower elected to make the lower "minimum required payment,"

however, the interest remaining unpaid for that month would be

added onto the loan principal, resulting in "negative amortiza-

tion," and the interest due the following month would be calcu-

lated on the basis of the higher adjusted loan principal. 

On October 31, 1990, Ray and Richards conveyed their

Milford residence, subject to the Dime Savings mortgage, to

appellants Robert and Jennifer Grunbeck, who occupied it as their

principal residence. After the Grunbecks ceased payments on the

mortgage in 1993, Dime Savings instituted foreclosure proceed-

ings. The Grunbecks responded with an Ex Parte Petition for

Injunctive Relief in New Hampshire state court, claiming, inter 

alia, that the negative amortization provision "compounded" 

interest and, therefore, violated the Simple Interest Statute.1
 

1The Simple Interest Statute provides:

Any first mortgage home loan made under the
provisions of this chapter [Chapter 397-A:
Licensing of Nondepository First Mortgage
Bankers and Brokers of Title 35 Banks and
Banking; Loan Associations; Credit Unions]
shall provide for the computation of interest
on a simple interest basis. 

3

Dime Savings promptly removed the case to federal district court,

see 28 U.S.C. 1441, 1446; see also id. 1332 (diversity 

jurisdiction), then moved to dismiss on the ground, amongst

others,2 that section 501(a)(1) of the Monetary Control Act

preempts the Simple Interest Statute. In due course the district

court entered judgment for Dime Savings, see Grunbeck v. Dime 

Sav. Bank of New York, FSB, 848 F. Supp. 294, (D.N.H. 1994), and 

the Grunbecks appealed.

II II

DISCUSSION DISCUSSION 

A. Standard of Review A. Standard of Review 

We review Rule 12(b)(6) dismissals de novo, crediting 

all well-pleaded allegations. Clarke v. Kentucky Fried Chicken 

of Cal., Inc., 57 F.3d 21, 22 n.1 (1st Cir. 1995). For present 

purposes, therefore, we accept the allegation that the negative

amortization provision in the loan agreement "compounds" interest

and thus contravenes the Simple Interest Statute. Accordingly,

 

N.H. Rev. Stat. Ann. 397-A:14(I). 

2Dime Savings presented additional defensive claims below,
including that (1) the SIS is preempted by 804(c) of the 
Alternative Mortgage Transaction Parity Act of 1982, 12 U.S.C. 
3803(c) (1988), (2) the negative amortization provision in the
Dime Savings note does not "compound" interest and, therefore,
does not violate the SIS, and 3) for various reasons, the Grun-
becks lack "standing" to challenge the SIS. The district court
bypassed these claims, and dismissed on the Monetary Control Act
preemption ground. Grunbeck v. Dime Sav. Bank of New York, FSB, 
848 F. Supp. 294, 296 n.2 (D.N.H. 1994). We do not address these
claims. In particular, we bypass the "standing" claim because
the undeveloped record does not enable its reliable determina-
tion. 

4

we turn to consider whether the statute, so construed, is pre-

empted by section 501(a)(1).3 

B. Monetary Control Act Preemption B. Monetary Control Act Preemption 

Congress' power to preempt state law derives from the

Supremacy Clause of the United States Constitution. E.E.O.C. v. 

Massachusetts, 987 F.2d 64, 67 (1st Cir. 1993). "[I]n any 

preemption analysis, 'the question of whether federal law pre-

empts a state statute is one of congressional intent.'" Green- 

wood Trust Co. v. Massachusetts, 971 F.2d 818, 823 (1st Cir. 

1992), cert. denied, 113 S. Ct. 974 (1993) (quoting French v. Pan 

Am Express, Inc., 869 F.2d 1, 2 (1st Cir. 1989)). Although the 

preemption power is not liberally exercised by Congress, id. 

(citing Gregory v. Ashcroft, 111 S. Ct. 2395, 2400 (1991)), if a 

federal statute includes an express preemption provision the

court need only determine its scope. Id. (citing Cipollone v. 

Liggett Group, Inc., 112 S. Ct. 2608, 2618 (1992)).  

1. Rules of Construction 1. Rules of Construction 

The scope of an express preemption provision is

gleaned, first and foremost, from the language of the federal

statute, employing traditional rules of statutory construction.

 

3The district court construed the SIS as a ban on "compound
interest," or "charg[ing] interest on interest." Grunbeck, 848 
F. Supp. at 296 n.2, 298-300, 302-03. The parties do not dispute
its construction. In addition, the State of New Hampshire
asserted in its amicus memorandum below, that "The New Hampshire
Banking Department has construed the [SIS] as banning regulated
mortgage companies from using any computational method other than
simple interest in loan products including, specifically,
assessments of interest on deferred interest unless the
practice is permitted by overriding federal law." 

5

CSX Transp., Inc. v. Easterwood, 113 S. Ct. 1732, 1737 (1993) 

("If the statute contains an express pre-emption clause, the task

of statutory construction must in the first instance focus on the

plain wording of the clause, which necessarily contains the best

evidence of Congress' pre-emptive intent."). Of course, if the

statutory language is ambiguous, Burlington N. R.R. Co. v. 

Oklahoma Tax Comm'n, 481 U.S. 454, 461 (1987), or would work an 

unreasonable result, we may consult relevant legislative history,

Cabral v. INS, 15 F.3d 193, 194 (1st Cir. 1994), to confirm an 

interpretation indicated by the plain language. Strickland v. 

Commissioner, Maine Dep't. of Human Servs., 48 F.3d 12, 17 (1st 

Cir.), cert. denied, 116 S. Ct. 145 (1995), (citing INS v.  

Cardoza-Fonseca, 480 U.S. 421, 432-43, 446 (1987)).  

Where Congress has spoken directly to the issue, an

interpretation rendered by the agency responsible for administer-

ing the statute is entitled to no special deference. Chevron, 

U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 

837, 842 (1984). In all events, the courts will reject an agency

interpretation which conflicts with congressional intent. Id. at 

843 n.9. Finally, we attribute "ordinary meaning" to plain

statutory terms, see Greenwood Trust, 971 F.2d at 824 (citing 

Morales v. Trans World Airlines, Inc., 112 S. Ct. 2031, 2036 

(1992)), but may reject an express preemption claim absent a

sufficiently clear license to trespass on state sovereignty. See 

E.E.O.C., 987 F.2d at 68 (citing Gregory, 111 S. Ct. at 2401).  

The Monetary Control Act preemption provision relied

6

upon by the district court states in relevant part:

The provisions of the constitution or laws of 
any State expressly limiting the rate or 
amount of interest, discount points, finance 
charges, or other charges which may be 
charged, taken, received, or reserved shall 
not apply to any loan, mortgage, credit sale, 
or advance which is  
(A) secured by a first lien on 
residential real property . . .; 
(B) made after March 31, 1980; and
(C) described in section 527(b) of
the National Housing Act . . . . 

12 U.S.C. 1735f-7a(a)(1) (emphasis added).4 Like the district

court, see Grunbeck, 848 F. Supp. at 297-98, the parties focus 

their preemption analyses primarily on the phrase "limiting the

rate or amount of interest." 

As Dime Savings views the matter, the SIS plainly

"limits" the "rate or amount of interest" received in the sense

that more interest would be paid by the borrower were "compound- 

ing" not banned under the SIS; and the SIS effectively "limits"

the "amount" of interest the lender can recover in the sense that

the lender could earn more interest were it permitted to charge

interest at the same "rate" calculated on a compound basis. 

These arguments rest on the implicit premise that the

"amount" of interest the lender may charge is "limited" by the

SIS. On the contrary, the SIS imposes no restriction on either

the "rate" or the "amount" of interest the borrower may be

charged, but merely requires that any interest rate or amount 

 

4The Grunbecks do not dispute that the Dime Savings mortgage
loan meets the three criteria set out in s (A)-(C). Grunbeck, 
848 F. Supp. at 297 n.4. 

7

agreed to by the parties be computed on a "simple interest" 

basis. Thus, nothing in the SIS prevents a lender from contract-

ing for whatever simple interest rate will exact an interest 

return equal to or greater than whatever rate and amount of

interest would be recoverable through compounding. The SIS

leaves entirely to the parties the rate and amount of simple

interest to be exacted. 

The Dime Savings interpretation blurs the distinction

between the terms "rate" and "amount" of interest, as used in

section 501(a)(1). It assumes that the central question  

whether the SIS limits the "rate" of interest is to be re-  

solved through reference to the effect the SIS ban against 

charging interest on interest might have upon the "amount" of

interest the lender may be able to command in the marketplace. 

Not only does this assumption implicitly acknowledge that the SIS

itself imposes no statutory limit on the simple interest "rate" 

lenders may charge, but it alters the fundamental focus of the

preemption debate by inquiring whether the SIS might make it more

difficult for lenders to command in a better-informed market-

place (i.e., wherein a "simple interest" calculation is mandato-

ry) either the rate or amount of interest otherwise obtainable

by "compounding."5 
 

5As the district court observed, "without being able to
charge interest on interest, many lenders would not allow poten-
tial borrowers to defer accrued interest." Grunbeck, 848 F. 
Supp. at 299. In other words, many lenders might choose not to 
compensate by increasing the simple interest rate, and might not
permit borrowers to defer interest payments on which no interest 
could be charged. Although unimpeachable, these considerations

8

No less importantly, the shift in analytic focus

attending the Dime Savings' assumption undermines the required

"plain language" interpretation, see Morales v. Trans World 

Airlines, Inc., 504 U.S. 374, 383-84 (1992), by extirpating  

from the pivotal section 501(a) clause: "expressly limiting the

rate or amount of interest" the important modifier "express-

ly." Thus, the preemption inquiry urged by Dime Savings would

focus not on whether the "express" language of the SIS "limit[s]"

the rate or amount of interest which the lender may charge, but

on broad-gauged assessments concerning the likely impact the SIS 

ban on compounding would have on home-mortgage lenders and the

industry at large. 

When engaged in the task of statutory interpretation,

"[c]ourts . . . should . . . attempt to give meaning to each word

and phrase." See United States v. Flores, 968 F.2d 1366, 1371 

(1st Cir. 1992). Thus, in our view the district court mistakenly

inquired whether the SIS ban against charging interest on inter-

est could affect the amount of interest lenders might command in 
 

are inapposite to the present discussion.
First, were a lender to opt not to permit deferments of
interest payments, it nonetheless would receive both the rate and
amount of simple interest for which it contracted on all monies
loaned. Second, in any such transaction it could not be said
that the SIS, either directly or effectively, limited the legal 
rate or amount of interest chargeable by the lender. To be sure,
lenders who chose not to offset the SIS ban by raising the simple
interest rate, or chose not to permit deferments of interest
payments, would realize less total interest income as a result of
their lending decision. But as the State noted in its amicus
memorandum below, "[t]o the extent that this requirement may
affect the total amount of interest potentially realizable under
the Dime [Savings] loan, such effect is incidental to the re-
quirement and cannot be viewed as an 'express' usury ceiling." 

9

the marketplace, thereby not only eliding the term "expressly"

but overlooking the term "limiting" however defined.6

Moreover, the language Congress employed in section

501(a)(1) "expressly limiting the rate or amount of interest"

contrasts sharply with the preemption language in companion

section 521 of the Monetary Control Act, whereby Congress pre-

empted all state legislation "with respect to interest rates" in 

order to protect federally insured State-chartered banks from

State regulation of credit card transactions. See 12 U.S.C.  

1831d(a) (emphasis added). See also Greenwood Trust, 971 F.2d at 

830 n.10 ("[S]ection 501 addresses different categories of

lenders and loans and contains materially different preemption

terms than does section 521."). Thus, it is important to recog-

 

6In parsing the 501(a)(1) text, the district court recog-
nized that the parties' differing views as to the significance of
the term "limiting" accounted for their widely divergent inter-
pretations. The court observed that "Dime [Savings] essentially
construes 'limiting' as an adjective meaning 'serving to restrict
or restrain.' . . . The Grunbecks and the State ... essentially
construe 'limiting' as a verb meaning to impose a 'final, utmost
or furthest boundary' on permissible interest rates or amounts."
Grunbeck, 848 F. Supp. at 298.  
In our view, however, the plain statutory language cannot be
read as Dime Savings suggests, without ignoring the term "ex- 
pressly," see Flores, 968 F.2d at 1371, and without disregarding 
the "ordinary meaning" of the term "limiting," see Greenwood 
Trust, 971 F.2d at 824. The SIS itself, as distinguished from 
market forces, does not "serve to . . . restrain" either the rate 
or amount of simple interest which may be obtained, since the
lender remains free to compensate by increasing the simple
interest rate. Thus, the SIS does not "expressly" limit "the
rate or amount of interest." Nor, in the alternative, does the
SIS as distinguished from market forces "limit" the rate or 
amount of interest if "limit" means a "final, utmost or furthest
boundary" on the rate or amount of interest, since the SIS
imposes no ceiling whatsoever on either the rate or amount of 
simple interest that may be exacted. 

10

nize that the Congress which enacted the Monetary Control Act was

acutely aware that its choice of the distinctive terminology 

"expressly limiting" would serve as the primary interpretive

tool through which its preemptive intent would be revealed to the

courts. See BFP v. Resolution Trust Corp., 114 S. Ct. 1757, 1761 

(1994) (Congress is presumed to act with intent and purpose when

it uses particular language in one section of a statute and not

in another.).7 
 

7The district court drew encouragement for its preemption
ruling from "[p]revious interpretations of similar language in
similar legislation," with particular reference to the National
Bank Act of 1864, ch. 106, 13 Stat. 99 (codified as amended in
various sections of Title 12, United States Code). Grunbeck, 848 
F. Supp. at 300. Section 85 of the National Bank Act provided
that "a bank may charge 'interest at the rate allowed by the laws
of the State, . . . where the bank is located and no more.'"
Citizens' Nat'l Bank of Kansas City v. Donnell, 195 U.S. 369, 373 
(1904). Section 86 stated that "taking, receiving, or charging
'a rate of interest greater than is allowed by the preceding
section, when knowingly done, shall be deemed a forfeiture of the
entire interest which the note, bill, or other evidence of debt
carries with it, or which has been agreed to be paid thereon.'"
Id.  
The district court expressed the view that Donnell supports 
a broad reading of 501(a)(1), in two respects.

First, it offers persuasive support for con-
struing "laws limiting the rate or amount of
interest" to include laws prohibiting com-
pound interest. . . . Second, it indicates
that such laws also qualify as state "usury
laws" which the title to 501(a)(1) indi-
cates Congress intended to preempt.

Grunbeck, 848 F. Supp. at 301. We think the district court 
misapprehended the purport of Donnell, as well as its bearing 
upon the question before us. 
First, the National Bank Act is largely inapposite to 501 501
of the Monetary Control Act. In drafting 501, Congress did not
borrow language from the National Bank Act. On the other hand,
Congress did borrow language from the National Bank Act in
drafting 521 of the Monetary Control Act. Greenwood Trust, 971 521 
F.2d at 827. "[S]ection 521 was conceived as an offspring of

11

2. Legislative History  2. Legislative History  

Even assuming ambiguity in the phrase "expressly

limiting the rate or amount of interest," see Cabral, 15 F.3d at 

194, relevant legislative history clearly reflects a congres-

sional intention to confine the scope of section 501(a)(1)

preemption to state laws which impose express ceilings on the 

rate or amount of interest which may be charged, as distinguished

from bans against charging interest on interest or compounding. 

The legislative aim in enacting section 501 focused on "state

usury ceilings," S. Rep. No. 368, 96th Cong., 2d Sess. 18-19, 

reprinted in 1980 U.S.C.C.A.N. 236, 254-55 (emphasis added), with 

particular emphasis on state usury laws which restrict interest

rates to below-market levels and result in artificial disruptions 

in the supply of home-loan mortgage funds.

The Committee finds that where state usury
laws require mortgage rates below market
levels of interest, mortgage funds in those
states will not be readily available and
those funds will flow to other states where
 

section 85 of the Bank Act . . . ." Id. at 830 n.10. Thus, the 
Monetary Control Act includes two separate and dramatically
different preemption provisions. Id. Consequently, an interpre- 
tation of the progenitor of 521, i.e., the National Bank Act, 521
affords little, if any, insight into the 501 preemption provi- 501
sion at issue in the present case. Second, Donnell is 
inapposite to the present inquiry not only because it construed
an unrelated statute 85 of the National Bank Act but
because the SIS does not "expressly limit[] the rate or amount of 
interest" even assuming that a ban against compounding can be 
considered a limitation on the rate of interest "allowed by the 
laws of the State . . . ." Donnell, 195 U.S. at 373. Indeed, it 
is surpassingly awkward to ascribe meaning to the term "express-
ly" if the SIS ban against compounding is considered an "ex- 
press[] limit[ation on] the rate or amount of interest" which may 
be charged, since no rate or amount of "interest on interest" may 
be charged under the SIS.

12

market yields are available. This artificial
disruption of funds availability not only is
harmful to potential homebuyers in states
with usury laws, it also frustrates national
housing policies and programs. 

Id. at 254. Congress thus sought to facilitate first-mortgage 

home loans at market rates, in order to enable an adequate credit

supply and strengthen the financial system. 

In addition to the adverse effects of
usury ceilings on credit availability, mort- 
gage rate ceilings must be removed if savings 
and loan institutions . . . are to begin to
pay market rates of interest on savings de-
posits. Without enhancing the ability of
institutions to achieve market rates on both
sides of their balance sheets, the stability
and continued viability of our nation's fi-
nancial system would not be assured. 

Id. at 255 (emphasis added).  

The district court correctly noted that Congress

intended to preempt state laws imposing usury ceilings, Grunbeck, 

848 F. Supp. at 299, but nonetheless concluded that "the [SIS] .

. . would limit the availability of mortgage funds in a way 

comparable to a numerical cap on interest rates." Id. (emphasis 

added). True, demand for home mortgage credit could be reduced

were lenders to decline to defer interest payments, even though

the SIS does not place a ceiling on simple interest rates. But

though potential homebuyers might borrow less (or not at all)

were lenders to decline to defer interest payments or demand too

high a rate or amount of simple interest for doing so, the

potential homebuyer's decision would be the result of market

forces, the phenomenon Congress set out to facilitate in its 

enactment of section 501(a)(1). That is to say, the SIS ban 

13

against charging interest on interest would neither "require 

mortgage rates below market levels of interest," nor cause 

"artificial disruption in funds availability." See 1980 U.S.C.- 

C.A.N. at 254 (emphasis added). 

Moreover, market adjustments in simple interest rates,

which New Hampshire home mortgage lenders are free to adopt under

the SIS, tend to promote equilibrium between credit supply and

credit demand. In contrast, lenders may be forced from a credit 

marketplace governed by interest rate ceilings where the only 

alternative is to make loans at interest rates below the levels

obtainable in competing loan markets. Credit supply is artifi- 

cially disrupted in such a lending environment because credit 

demand tends to go unmet where borrowers are attracted by below- 

market interest rates but lenders are not. As a result, credit 

demand and credit supply are less likely to attain equilibrium at

the usury-ceiling level. In these respects at least, a ban on

compounding is in no sense comparable to a mortgage interest rate

ceiling.8 Thus, an outright ban against charging interest on
 

8As a "[p]revious interpretation of similar language in
similar legislation," the district court cited to "Fourchon, Inc. 
v. Louisiana Nat'l Leasing Corp., 723 F.2d 376, 381-83 (5th Cir. 
1984) (construing phrase 'rate of interest' in [ 926(d) of the]
Preferred Ship Mortgage Act in accordance with previous construc-
tion of similar phrase in National Bank Act to preempt state law
prohibiting charging of interest on interest)." Grunbeck, 848 F. 
Supp. at 300. But the policies subserved by 926(d) of the
Preferred Ship Mortgage Act are much broader than those underly-
ing 501 of the Monetary Control Act. "The Preferred Ship
Mortgage Act was designed to avoid parochial limitations on the
ready availability of credit to the shipping industry by wholly 
and completely superseding state law and practice in every 
respect." Fourchon, 723 F.2d at 387 (Shaw, J., dissenting) 
(emphasis added). "[T]he policies behind the Preferred Ship

14

interest does not work the adverse effects on the credit market-

place which concerned Congress in section 501(a)(1), viz.,

artificial disruptions in credit availability caused by State 

ceilings on interest rates resulting in below-market rates. 

Accordingly, we believe the relevant legislative history provides

sturdy support for the view that the important modifier "express-

ly" may not be read out of section 501(a)(1) and the term "limit-

ing" is not to be equated with "banning." 

Congress also signaled its narrow preemptive intent

under section 501(a)(1) by insulating these mortgage loans from

state usury limitations only, and not from other state-law 

limitations encompassed within the "annual percentage rate" nor

other state-law limitations designed to protect borrowers:

In exempting mortgage loans from state usury
limitations, the Committee intends to exempt
only those limitations that are included in
the annual percentage rate. The Committee
does not intend to exempt limitations on
prepayment charges, attorney fees, late char-
ges or similar limitations designed to pro- 
tect borrowers.  

1980 U.S.C.C.A.N. at 255 (emphasis added). The district court

concluded, without elaboration, that "interest on interest

prohibitions . . . are 'included' in the interest rate." Grun- 

beck, 848 F. Supp. at 300. Dime Savings so contends on appeal, 
 

Mortgage Act support an expansive interpretation of the term
'rate of interest' in section 926(d)." Fourchon, 723 F.2d at 
382. As discussed above, however, see Section B.2, the policies 
underlying 501 of the Monetary Control Act do not support a
broad interpretation of the term "rate or amount of interest."
Consequently, the Fourchon interpretation affords little insight 
into the preemptive intent underlying 501 of the Monetary
Control Act. 

15

maintaining that the SIS ban against charging interest on inter-

est is included in the "annual interest rate." We cannot agree. 

In the first place, a ban against compounding interest

affords significant consumer protections to homebuyers. Charging

interest on deferred interest under a residential mortgage not

only increases the "unseen" costs of home ownership but erodes 

home equity. Moreover, the relevant legislative history address-

es "state usury limitations" only. The SIS, on the other hand, 

is no mere "limitation" but an outright ban against calculating

interest on interest. The ordinary meaning of the term "limit-

ing" is either as the district court and Dime Savings view it

"serving to restrict or restrain" or as the Grunbecks urge

to enforce a "final, utmost or furthest boundary." Id. at 

298. But the SIS does not merely "limit," nor does it simply 

"restrain," compounding; it prohibits it. Thus, the "plain 

language" interpretation advocated by Dime Savings cannot be

endorsed without disregarding the ordinary meanings of the

distinctive terms "ban" or "prohibit" and "limit" or "restrain."

See Greenwood Trust, 971 F.2d at 824.   

3. Administrative Regulations and Opinions  3. Administrative Regulations and Opinions  

Congress authorized the FHLBB and its successor, the

Office of Thrift Supervision ("OTS"), "to issue rules and regula-

tions and to publish interpretations governing the implementation

of [section 501]." 12 U.S.C. 1735f-7a(f). Judicial review of

an agency's interpretation of the statute it administers impli-

cates two preliminary inquiries. Strickland, 48 F.3d at 16 

16

(citing Chevron, 467 U.S. at 842-43). The first is whether 

Congress has "directly spoken to the precise question at issue."

Id. (quoting Chevron, 467 U.S. at 842) (internal quotation marks 

omitted). If not, we inquire "whether the agency's answer is

based on a permissible construction of the statute." Id. (quot- 

ing Chevron, 467 U.S. at 843) (internal quotation marks omitted). 

Although we accord deference to the agency's interpretation, the

final word on statutory interpretation is for the courts.

Chevron, 467 U.S. at 843 n.9 ("The judiciary is the final author- 

ity on issues of statutory construction and must reject adminis-

trative constructions which are contrary to clear congressional

intent."). Furthermore, "[i]f a court, employing traditional

tools of statutory construction, ascertains that Congress had an

intention on the precise question at issue, that intention is the

law and must be given effect." Id. Where an agency interpreta- 

tion is based exclusively on its reading of the bare statutory

language, no special deference is due. See Strickland, 48 F.3d 

at 16. Furthermore, if "the statute itself, viewed in connection

with the statutory design and the legislative history, reveals an

unequivocal answer to the interpretive question, the court's

inquiry ends." Id. at 17. 

a. FHLBB Regulations a. FHLBB Regulations 

The FHLBB has issued administrative regulations for the

implementation of section 501, see 12 C.F.R. Part 590 (1988), 

which focus upon the effect of interest ceilings on the avail- 

ability of mortgage credit. "The purpose of this permanent

17

preemption of state interest-rate ceilings applicable to Federal- 

ly-related residential mortgage loans is to ensure that the

availability of such loans is not impeded in states having

restrictive interest limitations. . . ." 12 C.F.R. 590.1(b)

(emphasis added). The FHLBB has reaffirmed that "[n]othing in

this section preempts limitations in state laws on prepayment

charges, attorneys' fees, late charges or other provisions

designed to protect borrowers." Id. 590.3(c).  

A statute that imposes an outright ban against com-

pounding does not place a "ceiling" on interest rates or amounts.

See supra pps. 12-14. Moreover, assuming it may affect loan 

demand, a ban against charging interest on interest does not

artificially disrupt the availability of home mortgage credit. 

See supra at pps. 12-15. Finally, given the commercial reali- 

ties, it is reasonably clear that the SIS ban against charging

interest on interest not only affords important protections to

homebuyers but does so without "expressly limiting" interest

rates.

b. The FHLBB and OTS Opinions  b. The FHLBB and OTS Opinions 

In response to an inquiry in 1984 as to whether "Michi-

gan laws regarding the charging of interest on deferred interest"

were preempted by section 501, the FHLBB opined that "state laws

which would prohibit the charging of [interest on] interest would

constitute provisions 'limiting the rate or amount of interest .

. . which may be charged. . . .' It is our opinion that such

charges are not consumer protection provisions of the type

18

contemplated by 12 C.F.R. 590.2(c) (1984) such as limitations

on prepayment charges, attorney's fees and late charges." Op.

Off. Gen. Counsel, FHLBB 1097 (November 15, 1984). In 1991, the

OTS followed suit with an opinion reaffirming the 1984 FHLBB

opinion that a state statute regulating "compounding" is preempt-

ed by section 501. Op. Off. Chief Counsel, OTS 91/CC-37 (Aug.

16, 1991).

We agree with the district court that these opinions

are not controlling. See Grunbeck, 848 F. Supp. at 298 ("Al- 

though these two opinions unequivocally support [Dime Savings']

reading of 501(a)(1), the regulators have failed to provide any

analytical support for [their conclusion]. In this circumstance,

absolute deference would be nothing more than blind al-

legiance."). The district court's observations are plainly

correct. Neither regulatory body tendered a rationale for its 

opinion. The FHLBB the first to address the question 

neither described, nor cited, the Michigan provision to which its

opinion related.9 And neither agency parsed the section 501(a)-

(1) preemption clause language. 

As deference ultimately "depends on the persuasiveness

of the agency's position," Strickland, 48 F.3d at 18, we agree 

that none is due in this instance. The interpretation adopted by

 

9The OTS indicated that the party requesting its opinion had
represented that Michigan has no statute on the subject and that
the Michigan provision relating to "interest on interest" origi-
nated in uncited caselaw announced around the turn of the centu-
ry. 

19

these agencies disregarded entirely the term "expressly" which

plainly constrains the scope of the section 501(a)(1) preemption

clause and overlooked the relevant legislative history explic-

itly declaring a congressional intention to preempt state usury-

law ceilings as distinguished from bans on compounding  

which result in artificial disruptions in home-mortgage loan

credit by mandating below-market interest rates. Finally, even 

assuming the FHLBB interpretation were apposite to the present

discussion, in the respect that the Michigan provision with which

it dealt imposed a ban on compounding, there is no explicit

indication that either agency considered the significant consumer

protections, see supra at 15, afforded by state bans such as 

the SIS against charging interest on interest. For these and

other reasons discussed at length in this opinion, we conclude

that the agency interpretation relied on by Dime Savings is

unpersuasive and entitled to no deference in the present context.

c. The Parity Act c. The Parity Act 

The district court rejected the State's argument that

passage of the Alternative Mortgage Transaction Parity Act of

1982 ("Parity Act"), 12 U.S.C. 3801 et seq., two years after 

passage of the Monetary Control Act, supports a narrow construc-

tion of the preemptive scope of section 501(a)(1). Grunbeck, 848 

F. Supp. at 301-02. We nonetheless believe that significant

insight can be gleaned from the Parity Act. 

The Parity Act preempts State bans on certain "alterna-

20

tive mortgage transactions,"10 by which is meant "all manner of

mortgage instruments that do not conform to the traditional

fully-amortized, fixed-interest-rate mortgage loan." First 

Gibraltar Bank, FSB v. Morales, 19 F.3d 1032, 1037 (5th Cir. 

1994), cert. denied, 115 S. Ct. 204, vacated on other grounds, 42 

F.3d 895 (5th Cir. 1995) (per curiam). Common forms of "alterna-

tive mortgage transactions" include adjustable interest rate

mortgages, which may permit negative amortization, and graduated

payment mortgages, which may temporarily lower the mortgage

payment to less than the monthly interest due, resulting in

planned negative amortization whereby interest is charged on the

deferred interest. Id. (citing generally to Grant S. Nelson & 

Dale A. Whitman, Real Estate Transfer, Finance, and Development 

1000-13 (4th ed. 1992)). Other planned negative amortization
 

10The term "alternative mortgage transaction" means a
residential mortgage loan 
(A) in which the interest rate or
finance charge may be adjusted or
renegotiated;
(B) involving a fixed-rate, but
which implicitly permits rate ad-
justments by having the debt mature
at the end of an interval shorter
than the term of the amortization
schedule; or
(C) involving any similar type of
rate, method of determining return,
term, repayment, or other variation
not common to traditional fixed-
rate, fixed-term transactions, in-
cluding without limitation, trans-
actions that involve the sharing of
equity or appreciation;
described and defined by applicable regula-
tion. 

12 U.S.C. 3802(1). 

21

provisions include the reverse annuity mortgage ("RAM") and the

credit conversion mortgage, both of which charge interest on

deferred interest. Id. "An alternative mortgage transaction may 

be made by a housing creditor in accordance with [section 3803],

notwithstanding any State constitution, law or regulation." 12

U.S.C. 3803(c). It is a requirement of section 3803 that for

"housing creditors [other than banks and credit unions] . . .

transactions [must be] made in accordance with regulations

governing alternative mortgage transactions as issued by the

[OTS] . . . ." Id. 3803(a)(3). These OTS regulations, see 12  

C.F.R. 545.33(f)(4)-(11) (1988), impose, inter alia, substan- 

tial lender disclosure requirements relating to features unique

to alternative mortgage transactions. 

The State argued below that it would be "'illogical and

contrary to public policy'" for Congress to require as a

precondition to preemption under the Parity Act that negative

amortization loans conform with OTS disclosure regulations "if

lenders could claim preemption for the same transactions under

[the Monetary Control Act] without making the required disclo-

sures." Grunbeck, 848 F. Supp. at 302. Although, as the dis- 

trict court correctly observed, "[c]onstruing the Monetary

Control Act to preempt simple interest laws does not eliminate 

the incentive for lenders to comply with the Parity Act's disclo-

sure requirements," id. (emphasis added),11 it must also be 
 

11The court explained that "negative amortization provisions
are not the only characteristics that qualify a loan as an
alternative mortgage transaction," and, further, that "[s]imple

22

noted that negative amortization provisions whereby interest is

assessed on deferred interest are common features in various 

forms of alternative mortgage transactions; e.g., graduated 

payment mortgages, RAMs, and credit conversion mortgages.

Because a ban against charging interest on interest would pre-

clude a central feature common to many forms of alternative

mortgage transactions, simple interest statutes unquestionably

infringe upon alternative mortgage loans, even though they do not

impose an outright ban. Thus, as the State contends, construing

the Monetary Control Act so as to preempt simple interest laws,

such as the SIS, would significantly reduce these alternative 

mortgage lenders' incentive to comply with the Parity Act disclo-

sure requirements. Whether or not illogical, there can be little

question that this result would conflict with the policy underly-

ing the Parity Act and, thus, with the intent of Congress. 

As the district court noted, "the Parity Act and the

Monetary Control Act serve related but distinctly different

functions." Id. The Parity Act represents a congressional 

response to a concern, amongst others, that State bans on mort-

gages other than traditional fixed-rate mortgages would reduce

the overall availability of mortgage credit, since fixed-rate

mortgages had become relatively more expensive as the result of

increased interest-rate volatility. 

The Congress hereby finds that 
 

interest laws are merely one of several categories of" state laws
"inconsistent with a qualifying lender's right to issue alterna-
tive mortgage loans." Id.  

23

(1) increasingly volatile and dy-
namic changes in interest rates
have seriously impaired the ability
of housing creditors to provide
consumers with fixed-term, fixed-
rate credit secured by interests in
real property, cooperative housing,
manufactured homes, and other dwel-
lings;
(2) alternative mortgage transac-
tions are essential to the provi-
sion of an adequate supply of cred-
it secured by residential property
necessary to meet the demand ex-
pected in the 1980's; . . . .

12 U.S.C. 3801(a). These concerns prompted Congress to autho-

rize State-chartered housing lenders, such as Dime Real Estate 

NH, to enter into alternative mortgage transactions. 

It is the purpose of [the Parity Act] to ...
provide [nonfederally chartered housing cred- 
itors] . . . parity with federally chartered
institutions by authorizing all housing cred-
itors to make, purchase, and enforce alterna-
tive mortgage transactions so long as the
transactions are in conformity with the regu-
lations issued by the Federal agencies.

Id. at 3801(b). See also First Gibraltar Bank, FSB, 19 F.3d at 

1043. Thus, the purpose of the Parity Act was to preempt State

bans on alternative mortgage transactions, including adjustable 

rate mortgages permitting negative amortization whereby interest

may be charged on deferred interest payments.12

In the Monetary Control Act, on the other hand, Con-

gress was responding to the very different concern that State
 

12The parties do not dispute that the Dime Savings loan is
an "alternative mortgage transaction," though they disagree
whether the loan was made in accordance with OTS regulations. We
do not resolve the Dime Savings' Parity Act preemption claim as
applied to the present loan, however, since it has not yet been
considered by the district court. 

24

interest-rate ceilings were depressing home-mortgage interest 

rates to below-market levels, thereby artificially disrupting the 

availability of funds for both traditional fixed-rate mortgages

and "alternative mortgage transactions." The latter concern

prompted Congress to preempt only state laws "expressly limiting

the rate or amount of interest." Thus, section 501(a)(1) of the

Monetary Control Act was not aimed at preempting State laws, such

as the SIS, which prohibit "alternative mortgage transactions"

permitting negative amortization whereby interest may be charged

on deferred interest. 

III III

CONCLUSION CONCLUSION 

We hold that the New Hampshire Simple Interest Statute,

as applied to the Dime Savings loan, is not preempted by section

501(a)(1) of the Monetary Control Act. Consequently, we remand

to permit the district court to consider the remaining issues

relating to the petition to enjoin foreclosure on the Grunbeck

residence. 

The judgment is vacated and the case is remanded for The judgment is vacated and the case is remanded for 

further proceedings consistent with this opinion. Costs are further proceedings consistent with this opinion. Costs are 

awarded to appellants. awarded to appellants. 

25